Filed 9/7/16  P. v. Mathis CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANNY LEON MATHIS,<br><br>    Defendant and Appellant. | F068443<br><br>(Super. Ct. No. BF140392A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Danny Leon Mathis appeals from his conviction for the first degree murder of Ruben Torres. We conclude the trial court committed prejudicial error when it precluded

introduction of a hearsay statement by the only witness to the killing. Mathis sought to offer, as a statement against penal interest, a declaration made by his ex-girlfriend, Chasidy Wilhite, to her on-and-off lover, Jose Pineda. Wilhite told Pineda that she set up the killing of Torres and actively assisted in its commission. The court excluded Pineda's proffered testimony because it found the declaration was not trustworthy and Pineda lacked credibility. This was prejudicial error and an abuse of discretion because the court did not apply the proper legal principles in evaluating the declaration's trustworthiness. Accordingly, the judgment is reversed and the matter remanded for a new trial.

## PROCEDURAL HISTORY AND FACTS

Mathis was charged by an information with the first degree murder of Ruben Torres. (Pen. Code,[1] §§ 187, subd. (a), 189.) The information alleged that Mathis had served three prior prison terms. (§ 667.5, subd. (b).) The jury found Mathis guilty of first degree murder. Thereafter, the prosecution dismissed the three prior prison term allegations. Mathis was sentenced to an indeterminate term of 25 years to life in state prison.

*Factual Summary*

During police questioning, Mathis confessed to severely beating Ruben Torres on Thursday, January 26, 2012. Mathis stated that he beat Torres at the home of Chasidy Wilhite in Weldon, a small town located in the mountains approximately 40 miles northeast of Bakersfield. Wilhite, Mathis' ex-girlfriend, was dating Torres at the time. Torres fell unconscious during the beating and Mathis left him overnight, bound and gagged, in a chicken coop on the property. Mathis spent the night with Wilhite at her house. The next day, Friday, he borrowed a red Pontiac Sunfire from his old friend, Sharon Ledlow. He put Torres's body in the trunk and drove towards Bakersfield. The

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

2.

car broke down and Mathis had it towed back to Ledlow's house in Weldon on Saturday afternoon.[2] Ledlow's house is approximately one mile from Wilhite's.

Several people were present at Ledlow's house on Sunday, January 29: her friend Susan Dawson, Dawson's son, Landon Larson, and his girlfriend, Mylee Dorner. All three had spent the night there. Mathis had left Saturday night but returned the following morning and went to sleep in Ledlow's bedroom. Ledlow left for the store and missed a phone call from Wilhite while she was out; when she got back at about 10:00 a.m., she returned the call.

After talking on the phone with Wilhite, Ledlow asked Dawson to go outside with her to look in the trunk of her Pontiac. Torres's body, clad only in blue boxers, was in the trunk. The body was curled up in a fetal position. Dawson called Dorner outside to confirm they were looking at a dead body. Dorner looked in the trunk and called 911.

Deputy Erik Levig of the Kern County Sheriff's Office responded to the 911 call. Deputy Levig saw the body in the trunk and noted it was stiff with rigor mortis; the head and upper torso were covered with a dark-colored cloth-like material; the arms were positioned behind the back and the legs were bent backward at the knee.

Mathis was the last person to drive the Pontiac and the police were directed to him at the beginning of the investigation. Mathis was taken for questioning to the Kern County Sheriff's Office substation in Kern Valley that same day (Sunday). He was questioned by Detectives Jason Balasis and Kavin Brewer.

*Police Interrogation*

*Summary*

Mathis gave rambling and contradictory answers over the course of the interrogation. Since Mathis's answers were confusing and, on some points, inconsistent,

---

[2] Ledlow's friend, Susan Dawson, saw the tow truck pull into Ledlow's driveway with Ledlow's car in tow; Mathis got out of the passenger side of the tow truck.

3.

the detectives' questions repeatedly covered the same ground. As a result, the interrogation was long, repetitive, and exhaustive. Mathis provided multiple accounts of the relevant events but, over time, a relatively clear outline of events emerged.

Wilhite called Mathis over to her house. Wilhite assured Mathis that Torres, who possessed a shotgun that he had threatened to use against Mathis, was not present. Wilhite's assurances turned out to be false; Torres was, in fact, present. Mathis understood that Wilhite was upset with Torres because he had been stealing from her. She wanted Mathis to teach him a lesson. Goaded by Wilhite, Mathis agreed to "slap [Torres] around," in part because he was angry with Torres for dating Wilhite.

Torres, however, surprised Mathis by attempting to shoot him with a shotgun. Mathis freaked out and beat Torres more severely than he had intended; he did not stop until Torres "quit moving." Wilhite was present and helped Mathis; she also tied and gagged Torres after the beating. Mathis then carried Torres out to a chicken coop on the property. Torres remained in the coop until Mathis moved his dead body to the trunk of Ledlow's car. Either Ledlow or Wilhite disposed of the shotgun. Mathis drove to Bakersfield intending to dump the body. The car broke down and Mathis had it towed to Ledlow's house. The next day, the body was discovered in the trunk.

Mathis squarely implicated Wilhite as a coparticipant in the crime, even as the person who precipitated the altercation, at various points in the interrogation. However, towards the end he stated he wanted to take the blame for everything and would not repeat his statements in court. He then changed his version of events so as to minimize Wilhite's role and claimed he alone was responsible for everything that happened to Torres.

Mathis's police interview was recorded and the video of the entire interview was played for the jury during Detective Balasis's testimony.

4.

*Interrogation Details*

We outlined the interrogation below. This reflects the repetitive rounds of questioning conducted by the detectives as well as Mathis's successive accounts of the relevant events.

Mathis was 50 years old at the time of the offense. For about two weeks leading up to the discovery of the body, he had stayed at Ledlow's house. Prior to that he was in Oklahoma for two weeks, to see his parents and a previous girlfriend. He left for Oklahoma after arguing with Wilhite; Wilhite and Mathis had "been together" since they met about nine months earlier. They had lived together in Bakersfield until Wilhite moved to Weldon over the previous summer to get away from drugs. Wilhite was a pharmacy technician and needed to remain clean and sober. Mathis moved back in with Wilhite in Weldon for approximately three months until he left for Oklahoma.

When Mathis got back from Oklahoma, he "wanted to get [Ruben's] ass … really bad" because Torres had disrespected him five times. Torres had called Wilhite and asked her to "smoke dope" with him and his friend; Mathis termed this "disrespect number one." Torres also called Wilhite a whore. Mathis said, "So I got mad, but I ran out and I told Sylvia, his mother[,] and him." Torres "did it three times again"—asking Wilhite to smoke dope—but Mathis "still didn't [react]." When Mathis returned from Oklahoma, Wilhite was doing drugs and her house was a mess. Mathis explained, "My trip was that [Ruben] disrespected me. I told him and, uh, and everybody else – I said all you gotta do is let me get him his ass whooping like he's got coming and I will leave it alone. And [Rodney Bethell] talked me outta even doing that, so did [Sharon Ledlow]. They said it's not worth it, leave him alone. [¶] … [¶] So that's what I did." Mathis said the last time he saw Torres was before he went to Oklahoma. Mathis also said that he had "slammed [dope]" two days prior to his interrogation.

Mathis recounted that around the same time, i.e., two or three nights before the interrogation, Wilhite and Torres had been drinking and got into a fight; Wilhite got a

5.

black eye and body slammed Torres. Wilhite called Mathis. He described their discussion as follows: "You know, and then – and then I get a phone call, she tells me, hey, come up here. I said, well, where's [Ruben]? She says I sent him down to clean the dog shit up out at his mom's house because his – it's filthy down there, man." Mathis said he thought of Wilhite as his girl because they had lived together and had a sexual relationship. Mathis also said, "You know when she gets in trouble she calls me." He explained, "I was able to go there and talk to her. [¶] … [¶] And I stayed that night." He said, "I came up there 'cause her relationship – she gets beat up, as you can tell by her black eye." Mathis also said that Wilhite told him that Torres was stealing things from her grandfather's shed when she was away from the house.

Mathis said that while he was in Oklahoma, Torres had gotten hold of a sawed-off shotgun and had been waving it around, acting as if Mathis was hiding in the bushes. When Wilhite called Mathis to ask him to come up to her place, she told him that Torres had left to clean up his mom's house and had taken the shotgun with him. Mathis went up to Wilhite's place, they had sex, and both "crashed out."

Regarding his possession of Ledlow's car, Mathis explained that Ledlow let him borrow it the next day, to look for his missing daughter, who used drugs "off and on" in Bakersfield. Wilhite gave him gas money; both Wilhite and Ledlow wanted him to hide and make evasive maneuvers as he drove out of the neighborhood.

Mathis said Torres had told other people "that, uh, he's gonna get the 12-gauge shotgun right here and he's gonna shoot me with it, but it didn't bother me because I wasn't going to hurt him." However, when Wilhite invited Mathis to her house the last Thursday or Friday—Mathis eventually said it was Thursday, January 26, 2012—Mathis did not simply go up to the house and walk in. Rather, he stood at the gate and yelled for Wilhite to come outside, in case Torres was around with the shotgun. Asked about any proactive efforts to protect himself, Mathis stated, "I'm not gonna go around carrying guns and shit like that." Torres was a "[s]lammer" who used Dolotin, morphine, speed,

and other drugs; he would "burn people." Mathis denied he had ever had any type of physical altercation with Torres.

Detective Balasis then asked Mathis, "Why do you think we're here now?" Mathis answered, "Well, apparently you guys got that thing in the back of that thing and a body bag that lady was bringing or something in the fucking car." Detective Brewer asked, "So who do you suppose is in the back of … the trunk of that car?" Mathis responded, "Well apparently I'm gathering it would be fucking [Ruben], Yeah?" Detective Balasis asked, "Why would you think it's [Ruben]?" Mathis replied, "Well isn't he – everybody's looking for him." The detectives and Mathis then had the following exchange:

> "[Brewer]: Danny, listen, if he threatened you with that shotgun and you guys got into it and you had to protect yourself, you need to tell us now. Because you know that we're going to check the body and everything else in the trunk that we've seen. And it's all gonna be swabbed for DNA. And if your DNA comes off of it, you've been to prison. We already have your sample, okay?
>
> "[Mathis]: Right.
>
> "[Balasis]: If your DNA comes off of it, this is the story that you're stuck with rather than – see what I'm saying? [¶] … [¶]
>
> "[Brewer]: Yeah. If he threatened to kill you with that and he comes after you with that gun and you got to protect yourself, you got – you need to tell us. I mean here people get scared after these things happen and do all kinds of things. They bury bodies and dump bodies off the freeway because they're scared. They don't know what the cops will think about it.
>
> "[Mathis]: Uh, look fellas.
>
> "[Brewer]: If this – listen. If this thing was I need to – I've got to protect myself, you need to tell us.
>
> "[Mathis]: Look. Look, fellas. Fuck it. That's – *I did that, okay? And when [Chasidy] called and told me [to be] there in five minutes, he come out with that fucking shotgun.*

7.

"[Brewer]: Where was he at?

"[Mathis]: At [Chasidy]'s." (Italics added.)

Mathis initially stated that when he went to Wilhite's house, Torres and Wilhite were in the yard. Torres had a shotgun; he tried to load it but it jammed. Mathis stated, "I'm not happy about what I did. I'm really not … And I tried five times. [¶] … [¶] No. I tried five times, you know? And, uh, and he come at me with a shotgun (unintelligible) whole fucking thing." Mathis continued, "That's when I just fucking started beating. I couldn't quit. [¶] … [¶] I just beat him and he quit moving. Before I realized, you know, and freaked the fuck out." Mathis said he got scared. Mathis did not know where the shotgun was at the time of his interrogation, but indicated that either Ledlow or Wilhite had taken it to dispose of it.

Mathis hit Torres with his fists and kicked him once in the jaw. Immediately after the beating, Mathis saw that Torres was not moving but did not know whether he was dead. He then hid Torres in a chicken coop outside Wilhite's house and left to try to get Ledlow's car to move the body. Torres had shorts on when he confronted Mathis but they came off when Mathis was pulling him; Torres was left wearing only boxers. Mathis stated, "I just didn't know what to do, man. I didn't." Mathis returned with Ledlow's Pontiac Sunfire; he put Torres's dead body in the trunk and drove to Bakersfield planning to "dump it," but could not bring himself to do it.

Mathis and Detective Brewer then had the following exchange:

"[Brewer]: She knew. That's how we showed up today. [Chasidy] called Sharon [Ledlow] and said, 'Go out and go open the trunk of your car.' Sharon went out and opened her trunk and ran down the street and called us. How – how could [Chasidy] find out?

"[Mathis]: She helped. She helped.

"[Brewer]: Did you – did you talk to her?

"[Mathis]: She helped me do it. She … [Detectives interrupted Mathis] [¶]…[¶]

8.

"[Brewer]:    … We've had a couple people call us already and almost tell us everything you just did.  I mean we knew that before we started.  Who did you tell?

"[Mathis]:    I didn't tell anybody.  I told Sharon.  I told Sharon…

"[Brewer]:    Oh.

"[Mathis]:     … (unintelligible) borrow her car.  *They both knew*.

"[Brewer]:    Okay.  Did anybody go with you to Bakersfield?

"[Mathis]:    No.

"[Brewer]:    By yourself?

"[Mathis]:    (Unintelligible).

"[Brewer]:    What were you gonna do with him?

"[Mathis]:    I was just gonna find a place to put him.  And I – I couldn't do it.

"[Brewer]:    Okay.  When – when he went in the trunk, tell me what was around his feet.

"[Mathis]:    He had nothing around his feet.

"[Brewer]:    Did – did you tie him up?

"[Mathis]:    Yes.

"[Brewer]:    How?

"[Mathis]:    [*Chasidy*] *tied him up* (unintelligible).

"[Brewer]:    By…

"[Mathis]:    (Unintelligible) his feet.

"[Brewer]:    Okay.  What –what did you use to tie him up with?

"[Mathis]:    *She tied him up with rope*.  [¶] … [¶]

"[Brewer]:    Did you put something over his head?

"[Mathis]:    No.

"[Brewer]:    Then his head wasn't covered with anything?

"[Mathis]:    Not that I'm aware of, no. *She came and she put a gag in his mouth.*  [¶] … [¶]

"[Brewer]:    Who would pick up that gun?

"[Mathis]:    Sharon or [Chasidy], one or the other.  [¶] … [¶]

"[Brewer]:    [It's] important that we find this gun.  [¶] … [¶]

"[Mathis]:    *Sharon's got the gun or* [*Chasidy*] *took the gun.  I'm telling you one or the other*."  (Italics added.)

Mathis said Torres dropped the shotgun when Mathis started to hit him.  Torres tried to fight back and swung at Mathis but did not manage to hit him.  Torres was bleeding from a busted lip after the beating.  Torres's shotgun was a 12-gauge pump shotgun with a sawed-off barrel.

Mathis's story then somewhat changed.  He explained that Wilhite had taken him to a backhouse or separate living quarters at the back of her house.  He lied earlier when he said the fight took place outside.  He said, "[Chasidy] and I, we're going in to the other living quarters.  I shut the door behind me.  [Ruben] come out with the shotgun.  [¶] … [¶]  … And that's where I got him.  [¶] … [¶] … [Chasidy] split after [Ruben] came out with a gun."  Detective Balasis and Mathis then had the following exchange:

"[Balasis]:    But when [Ruben] first came out with the gun, [Chasidy] was there?

"[Mathis]:    She was.  And – and – and she splits.  Now when – when he did that, I just – I – I didn't know what the – I don't know, you know what I mean?

"[Balasis]:    Mm-hm.

"[Mathis]: *But I don't want her implicated in nothing.  I loaded him up myself.  I did everything myself.*

"[Balasis]:  Did anybody else help you at all?

"[Mathis]:  No.  [¶] … [¶]

"[Balasis]: … But what I need to find out is before you put him in the trunk, there's some things on his body as far as not – he's not just in his boxer shorts.

"[Mathis]: The laundry thing over his head.

"[Balasis]: Yeah.

"[Mathis]: Belonged to [Chasidy].

"[Balasis]: Okay.

"[Mathis]: It was a laundry basket container or something from [Kohl's] or something.

"[Balasis]: Did you put that on him?

"[Mathis]: Yeah." (Italics added.)

Mathis said that he "did everything," including tying Torres up. He said he tied Torres up because he did not know whether Torres was dead and "didn't want him to leave and call the cops on me." Mathis said the incident had to have happened on Thursday night because he left Torres out there until the end of the following day, Friday, when he "went straight and I told Sharon what I did" and borrowed her car. [The car was towed back to Ledlow's place on Saturday and the body was discovered on Sunday.] Mathis again confirmed that "Sharon knew what I did." The questioning then proceeded as follows:

"[Balasis]: [Chasidy] knows too. Doesn't she?

"[Mathis]: Yeah.

"[Balasis]: Did you tell her?

"[Mathis]: *She was there, dude. But I'm not gonna say that in court. I'm gonna take the whole fucking thing. In fact,* [Chasidy] *tied him up. Put them ropes and hogtied him and put the cord – the thing in his mouth and everything. But this in court…*

"[Balasis]: Why did she do that?

11.

"[Mathis]:    *He stole from her all – the (unintelligible).  My intention of going over there…*

"[Balasis]:    Mm-hm?

"[Mathis:]:    … were to – to beat him up.  Just beat him up.

"[Balasis]:    Mm-hm.

"[Mathis]:    You know what I mean?  And not on the property.  Away.

"[Balasis]:    Uh-huh?

"[Mathis]:    And so he'd learn a – a lesson about doing that to people 'cause that's the way I was raised.

"[Balasis]:    Doing what to people?  What he did to you?

"[Mathis]:    Yeah.  You know, with other people's wives like that…

"[Balasis]:    Mm-hm.

"[Mathis]:    … and shit.  Just it – it's just not the thing to do.

"[Balasis]:    No.

"[Mathis]:    And you're not gonna learn if somebody don't slap you around a little.

"[Balasis]:    Mm-hm.

"[Mathis]:    And if you're already like that.  So that's – that was my intentions, to just make him open his eyes.  But when we got in that room, [Chasidy] started complaining her grandpa's shit being stolen, uh, put everywhere in packages to have him and take it we're doing.

"[Balasis]:    Oh.  So they're getting ready to steal up a lot of shit?

"[Mathis]:    All her shit.  And so I kinda got – didn't like to do that.  After the – the fucking shotgun fucking thing going on, you know what I mean?

"[Balasis]:    Uh-huh.

"[Mathis]:    And it just – I just fucking freaked.  I don't know what – I don't know why.  I don't know why, you know what I mean?  [¶] … [¶]

"[Balasis]:    Okay.

12.

"[Mathis]:     *… They both knew that I fucking killed him.  You know, I wasn't sure but…*

"[Balasis]:    But you think both?

"[Mathis]:     *Sharon and [Chasidy].*

"[Balasis]:    Okay.

"[Mathis]:     *But I'll tell you in court I'm not gonna say none of that.  I'm gonna take the whole (unintelligible) and I'll have to do that.*  [¶] … [¶]

"[Balasis]:    [We want to know the truth.]

"[Mathis]:     *The truth is he come out with that shotgun and that piece of fucking – I guess I killed him.*

"[Balasis]:    Okay.

"[Mathis]:     You know?  And I…

"[Balasis]:    And then you said you and [Chasidy] both tied him up?

"[Mathis]:     Yeah, me and [Chasidy] do that.

"[Balasis]:    All right.

"[Mathis]:     No, I had to tell [Chasidy] I need some rope.

"[Balasis]:    Where'd she get the rope from?

"[Mathis]:     I don't know but it's around [the house somewhere.] [¶] … [¶] I just fucked up.

"[Balasis]:    You know sometimes … [¶] … [¶]

"[Mathis]:     Did they tell you where the shotgun's at?

"[Balasis]:    Who?

"[Mathis]:     Sharon and them.

"[Balasis]:    Do they know?

"[Mathis]:     Yeah.

"[Balasis]:    Well they do?

13.

"[Mathis]: "Dude, I was at [Chasidy's] house last night when they took the guns (unintelligible)

"[Balasis]: Yeah.

"[Mathis]: When I was (unintelligible) it was there. And it was …

"[Balalis]: It was?

"[Mathis]: Yeah. They were debating who's gonna keep it.

"[Balasis]: Oh.

"[Mathis]: Tell 'em the least they could do is produce the shotgun to try to help my case a little bit."

The detectives told Mathis that they wanted to go over his entire story again, day by day, because he had changed his initial version of where the attack took place. Mathis explained that, on Thursday, he had asked Wilhite for "five minutes to come up there to talk to her" and "[s]he said okay." Mathis went with Wilhite into the room in the back quarters; as Torres emerged from the bathroom with the shotgun, Wilhite left and closed the door behind her. Mathis continued, "He comes out of there. He racks it. It jams. So that's when I got him. [¶] … [¶] And, uh, he obviously was hitting his head and shit as we were falling forward 'cause I was throwing him around. And we would fall down. And he – and he'd be on the bottom. And he'd hit his head on – on shit, you know what I mean?" Wilhite remained in the main house until Mathis went in and asked her to give him some rope.

The questioning proceeded as follows:

"[Balasis]: Okay. And what – what'd she say?

"[Mathis]: She said 'What you need rope for?' I said, 'I'm gonna tie him up until I get whatever, you know?' The shit I wanted to do.

"[Balasis]: What'd she say?

"[Mathis]: She got rope. She didn't realize he was dead. I really – really wasn't trying to kill him.

14.

"[Balasis]:    Were you – did you think he was dead at that point?

"[Mathis]:    At that point, no, you know what I mean?  It was –it was just – my mind was in fear, you know what I mean?

"[Balasis]:    Uh-huh.

"[Mathis]:    And, uh…

"[Balasis]:    So you went – you went back in and tied him up?

"[Mathis]:    No.  I tied him up *after we got – knocked him out or what – whatever the fuck we did to him.*

"[Balasis]:    So…

"[Mathis]:    *I just happened to kill him.  I didn't – I didn't – I didn't – I didn't think I did anything to actually kill him, you know what I mean?  I beat him.*

"[Balasis]:    Right.

"[Mathis]:    And I've been beat pretty good …

"[Balasis]:    Mm-hm.

"[Mathis]:    … and it didn't kill me.

"[Balasis]:    Sure.

"[Mathis]:    You know what I mean?  So I didn't – I didn't really like – like how, you know … [¶] … [¶] I wanted to beat him up.  That's all I wanted to do.

"[Balasis]:    Basically to show him … [¶] … [¶]

"[Mathis]:    Yeah.  And – and I mean per – where would my manhood be if – if, you know?  If I didn't try to pick my girl, you know what I mean?

"[Balasis]:    Yeah, absolutely.

"[Mathis]:    No matter what she says that – that we were together.

"[Balasis]:    Okay.

"[Mathis]:    You know?  You know.

15.

"[Balasis]:     So he's – he's un- he's unconscious.  You go over to the main house and you ask her for rope.

"[Mathis]:     Right.  She gives me a piece of rope and I tied him up.

"[Balasis]:     She gave you – you gave him – she gave you some rope.

"[Mathis]:     Right.

"[Balasis]:     You went back into the room?

"[Mathis]:     I tied him up.

"[Balasis]:     Tied him up?

"[Mathis]:     Yeah.  And I put him out there and everything.

"[Balasis]:     Out there?  When you tied him up, did he still have his shorts on?

"[Mathis]:     When I tied him up, he had it, yeah.  Yeah.  I believe he did.

"[Balasis]:     At what part do you think he lost his shorts?

"[Mathis]:     When I was put him in there with the laundry basket thing to – I went back up the hill and he was – I feared he was dead.

"[Balasis]:     When you – you haul him down the hill to the chicken coop. Is that still correct?

"[Mathis]:     I carried him down there.

"[Balasis]:     You carried him down there?

"[Mathis]:     Yes.

"[Balasis]:     Put him in the chicken coop.

"[Mathis]:     Right.

"[Balasis]:     And this is Thursday night, late?

"[Mathis]:     Right.

"[Balasis]:     Um, left him in the chicken coop that night?

"[Mathis]:     Right.

16.

"[Balasis]:     Trying to figure out what you're gonna do?

"[Mathis]:     Yeah.  And then I ... well I left it.  And then I – realized that he was dead.  And I realized that he was dead.  And the day that I borrowed Sharon's car, he stayed there 'til that day, whatever day that was."  (Italics added.)

Mathis said he stayed with Wilhite on Thursday night; the two had sex.

He said he "was awake all night" because "I kept – I kept – I kept going there to check, you know, see if he's moved or something, you know?  'Cause I – I – I didn't – I really didn't think I killed him.  I really didn't."  Torres did not move during the night and Mathis concluded: "*I just – and I realized I was – I had fucked up.*"  (Italics added.)

Mathis left the body in the chicken coop until the next night (Friday), when he loaded it into Ledlow's car.  Mathis explained that he drove around Friday night and into Saturday, with the car periodically either running out of gas or breaking down.  He could not bring himself to "dump" the body in the river as he had initially planned.  He had the car towed to Ledlow's place on Saturday.  He then went to see Wilhite on Saturday night and told her he would turn himself in, but Ledlow and Wilhite gave him a bunch of Valiums.**3**  The detectives asked Mathis what he was planning to do with the body. Mathis stated, "I had no idea what I was gonna do.  But I – I- my –when I –when I took them pills, my plan was to call you guys and tell you what I did."  Mathis continued, "'[c]ause I really like feel fucked up about the whole fucking thing, man.  It didn't have to go like that.  If he wouldn't have that fucking gun. [¶] ... [¶]  It – it didn't have to go that way.  All he had to do was come outside.  And – and then…"  Mathis said that either Ledlow or Wilhite had the shotgun, and he told the detectives to "[j]ust tell 'em I said please produce that gun and help my case."

Mathis and the detectives then had the following exchange:

"[Mathis]:     I mean that – they copped the fucking gun.  I'm telling you.

---

**3**     Dawson testified that she had dropped Ledlow off at Wilhite's house on Saturday evening and Ledlow returned home on her own later that night.

17.

"[Balasis]:  Her and Sh- Sharon?

"[Mathis]:  One of 'em's got the gun unless they've given it to somebody already.

"[Brewer]:  Okay.

"[Mathis]:  You know what I mean?  But the gun – the gun …

"[Brewer]:  (Unintelligible) real what would Sharon do with it?  Would she keep it in the house?

"[Mathis]:  Oh I have no idea.

"[Brewer]:  Hide it?

"[Mathis]:  I have no idea but I know that Sharon was all insistent that she keep the gun, you know what I mean?

"[Brewer]:  Yeah.  But then how 'bout [Chasidy]?  If she had it …

"[Mathis]:  [Chasidy] too."

Balasis asked where Chasidy would hide the gun.  Mathis explained that Wilhite's grandfather—who had owned the property before his death—was a professional trapper and taxidermist and kept "lots and lots of gun stuff … in the garages outside," as well as "kegs and kegs and kegs of gunpowder."  He added that Torres and his friend were stealing Wilhite's grandfather's things: "Loading shit and all that shit … getting in there and stealing all … [¶] … [¶] her grandpa's shit."

Seeking additional details, the detectives pressed Mathis to recapitulate for a final time, the "specifics" of his fatal fight with Torres.  Mathis said, "Well, [Chasidy] walked me out there.  And [Ruben] come out of that bathroom with the gun. [¶] …[¶] She closed the door, you know what I mean?  There's two doors, a security door and the wood door.  She closed the wood door.  [¶] … [¶]  Which –which that's what I intended anyhow.  [¶] … [¶]  Because I thought *we was all gonna talk to him and maybe slap him around a little bit* or something, you know what I mean?  [¶] … [¶]  'Cause I wasn't gonna – I

18.

wasn't gonna beat him bad, you know what I mean?" (Italics added).  The exchange between Mathis and the detectives continued as follows:

"[Balasis]:    Was…

"[Mathis]:    I just wanted …

"[Balasis]:    Was – was the goal going up there to talk to [Chasidy] or to talk to him?

"[Mathis]:    To talk to [Chasidy] for five minutes.

"[Balasis]:    Un-huh?

"[Mathis]:    Five minutes.  And…

"[Balasis]:    So it wasn't to talk to him?

"[Mathis]:    No.  I – I was under the assumption that he had went down the street.

"[Balasis]:    Why did you guys go to that room?

"[Mathis]:    That's just where we go 'cause kids are in the house and stuff like that.

"[Balasis]:    Why would she lead you to that room where he's at?

"[Mathis]:    I don't know.  I don't know.  But, um, when he came out with that shotgun and pointed it and it jammed…

"[Balasis]:    Did – did [Chasidy] ever talk about wanting him gone?  Recent?  I mean the last couple of days?

"[Mathis]:    I think – I think so to Sharon because she'd been finding stuff being stolen around there, you know?  And I don't steal.

"[Balasis]:    Right.

"[Mathis]:    I don't steal.  And I told Sharon, 'I – I want to talk to [Chasidy].'  She said to give her a couple more days and that – that kid will be gone.  [¶] … [¶]

"[Balasis]:    Oh.

19.

"[Mathis]: So in my – in my opinion, that's what – that's what it was. You – you know what I mean? It just happened sooner.

"[Balasis]: So…

"[Mathis]: See…

"[Balasis]: … you guys go up to the door. You walk in. And then she shuts the door?

"[Mathis]: Yeah. [¶] … [¶]

"[Balasis]: Did you think that was odd because you're supposed to…

"[Mathis]: No, no, no.

"[Balasis]: …come up there to talk to [Chasidy], right?

"[Mathis]: No, no. I didn't think that was odd. I – I think – I think at that point in time when I went in there and we were going to that building right there, when she do that I knew.

"[Balasis]: Mm-hm. [¶] … [¶]

"[Mathis]: And a lot of things happen like that. I knew what time it was. But I – *I didn't expect a shotgun. I thought she was just gonna let me whup his ass, you know what I mean*?" (Italics added.)

Mathis described in detail how the fight unfolded. When Torres surprised him with a shotgun, Mathis first knocked Torres into the bathtub. Torres tried to run but Mathis grabbed him in the front room and they "went all over the … place in there." There were little mini bikes stored in the room and Torres landed on them a few times. Torres tried to run out again but Mathis grabbed him from the back because he "wanted to talk to him" and "to whip his ass." Mathis stated, "I guess it went too far." Mathis said he hit Torres 15 to 20 times, and kicked him in the jaw when Torres "bragg[ed] about doing my girl." Mathis "lost it" when Torres said that. At a later point, Torres lost consciousness. Mathis said he could not tell if Torres was breathing or not because Mathis was "scared to death" and "freaking out in my own mind." He said he "hog tied" Torres, with his feet and hands tied around his neck. Mathis left the rope loose but

20.

jiggered it such that "if [Torres] was gonna … get up" it would "kind of tighten up a little bit"; however, Torres "never did." When asked about the material draped over Torres' head, Mathis said, "it's breathable. He could breathe through that net thing that I put over his head." "I mean I didn't [¶] …[¶] want him to suffocate."

The questioning concluded with the following exchange:

"[Balasis]: Now when you first told us about this, you said [Chasidy] helped you with tying him up. Is that true? I mean we want the truth.

"[Mathis]: No.

"[Balasis]: And that doesn't mean we're gonna charge her with anything. All this…

"[Mathis]: (Unintelligible).

"[Balasis]: All we want is the truth.

"[Mathis]: I did it.

"[Balasis]: You did it all yourself?

"[Mathis]: Yeah.

"[Balasis]: You didn't have any other friends help you at all? Not lifting his body or anything like that? Was he heavy?

"[Mathis]: No. I did it myself. [¶] … [¶]

"[Balasis]: Okay.

"[Mathis]: Can you do me a favor?

"[Balasis]: Sure.

"[Mathis]: Tell [Chasidy] to produce that shotgun."

*The Prosecution's Case-in-Chief and Argument*

The prosecution's case centered on Mathis's interrogation and, secondarily, the discovery of Torres's body in Ledlow's car. Ledlow passed away before trial in September 2013, and the prosecution decided not to call Wilhite as a witness. The

prosecution's witnesses, in order, were: Jesse Carl Burch (the tow truck driver who towed Ledlow's car back to her house); Dawson (Ledlow's friend); Dorner (Dawson's son's girlfriend); Deputy Erik Levig (who responded to the 911 call made by Dorner); Rodney Bethell (an acquaintance of both Torres and Mathis); Detective Balasis (the investigating officer); and Dr. Greg Pizarro (who performed the autopsy on the victim).

Burch testified that on Saturday, January 28, 2012, he was working as a tow truck driver and was dispatched to tow a car; Mathis was sitting in the driver's seat of that car. Mathis sat in the cab of the tow truck with Burch as Burch towed the car. Burch testified that Mathis appeared to be under the influence of methamphetamine. Burch said that Mathis "professed great affection for [his girlfriend]," whom he described as feisty and a good wrestler.[4] Burch further stated, "[t]here was mention in a vague sense of someone messing around with her," but that Mathis indicated "[the] matter had already been dealt with." On cross-examination, Burch testified that Mathis did not say that he did anything to the person messing with his girlfriend.

Dawson and Dorner testified next, about the circumstances surrounding the discovery of Torres's body in Ledlow's car. Deputy Eric Levig testified briefly about responding to the 911 call made by Dorner, looking at the dead body in the trunk of the

---

**4**    In a statement to the police that was played for the jury, Rodney Bethell also described Wilhite as "very belligerent." Similarly, in his police interrogation, Mathis described Wilhite, who had once hit him with the blunt side of a hatchet, as physically strong and tough. He also described Wilhite's reaction when one of her neighbors said something she did not like, as follows: "so she peels her shirt off, jumps the fence, kicks his dogs, opens his door up and runs in his house and commenced beating the shit outta him."

Apparently with reference to the same day that Torres was killed, Mathis, during the interrogation, also described a beating Wilhite gave Torres: "… and [Chasidy] commenced to beating [Ruben] up. She's a strong girl. We wrestle – play wrestle – I gotta handle her pretty tough to hold her down. And, uh, she was telling me how she was body slamming [Ruben], picking him up – really picking him up and body slamming him. [¶] … [¶] … beating the shit outta him." Mathis ended up going over to Wilhite's place because she had also got "beat up" during the fight.

22.

car (the body was partially covered with a blue tarp and tied with yellow rope), and talking momentarily to Mathis (who had been sleeping at Ledlow's house) before Mathis was secured in a law-enforcement vehicle.

The next witness, Rodney Bethell, went to Ledlow's house the day Torres's body was discovered. Bethell had seen Mathis "about a week" or perhaps "four or five days before this all happened, when he gave him a ride from Mt. Mesa to Weldon. Bethell's memory was cloudy but he recalled that "Ruben had been taking a few things out – out of Chasidy Wilhite's house, and [Mathis wanted to] try to talk to him about those items being missing. And Jacob – I don't know Jacob's last name. But him – Jacob and Ruben were stealing from Wilhite's house." Wilhite had dated Torres for about a month or a month and a half. Bethell testified that Torres was madly in love with Wilhite and hung out with her all the time; Torres did not have a loving family and he found in Wilhite someone who "care[d] a little bit about his feelings." Bethell testified that Torres told Bethell he wanted to protect Wilhite and had "a shotgun to do it with," but the judge struck the testimony as hearsay.

Bethell gave contradictory testimony about statements made by Mathis a few days before Torres's body was discovered. Bethell did not recall telling Detectives Brewer and Balasis, at Ledlow's house when the body was discovered, that three or four days earlier Mathis had told Bethell that he was going to kill Torres. On redirect examination, Bethell was impeached with a recorded statement he had given to Balasis that day. On the recording, Bethell told the detective that Mathis had said, "I'm going to [tear] [Torres] up[,] I'm going to kill him." Bethell also said that Mathis was sharpening a knife at the time, adding that Mathis always had a knife. After the recording was played, Bethell testified that Mathis had been "very upset about Chasidy and Ruben." Bethell stated that he had talked to the detective perhaps two days, or three to four days, or a week after Mathis made the statements to him. On cross-examination, Bethell testified that when he spoke to the detective, he was not 100 percent certain what Mathis had said.

23.

Bethell also admitted that he told defense investigators that, in the relevant conversation, Mathis did not say he was going to kill Torres; Mathis actually said he was going to "show [Torres] up."

Next, the prosecution called Detective Balasis. With Balasis on the stand, the prosecution played a video of Mathis's interrogation by Balasis and Brewer.[5] Balasis then testified about the interrogation of Mathis. He recounted that Mathis said he was upset with Torres and "wanted to kick his ass," but "he didn't act" on it because Bethell and others had "talked him out of it." Later, Mathis changed his story and said, "fuck it. I did it." Initially, Mathis said the altercation happened in the carport area on Wilhite's property; Mathis subsequently stated the incident occurred in "the little house" at "the back side" of the main residence. Regarding the shotgun Torres allegedly had, Mathis described it as "a sawed-off, pump-action shotgun. So the type that would pump on the fore handle. And then the stock was also sawed off, making it like a pistol grip, rather than having a butt stock that you'd put on your shoulder." Mathis's reasons for going to the backhouse also changed as first he said "he wanted to speak to Chasidy for five minutes" but later he said he intended to slap Torres around.

Mathis said "Ruben came out of the bathroom with the shotgun and pointed it at him [¶] … [¶] … Ruben attempted to rack it, but the gun jammed, and at that point [Mathis] quickly made up the distance, which he estimated was the distance of a bed or maybe two feet further than the bed, and began assaulting Ruben." Balasis testified Mathis did not indicate that he sought medical attention for Torres. Balasis further stated the chicken coop where Mathis said he stashed Torres's body was unheated and January nights in Weldon tended to be cold.

On cross-examination, Balasis testified that Mathis "appeared to cry a little bit" in explaining that Mathis started beating Torres when the latter pointed a shotgun at him.

---

[5] The contents of this questioning are outlined above.

Mathis also stated that he was not happy about the outcome but Torres came at him with a shotgun. Mathis stated that if the shotgun had not jammed, Torres would have shot Mathis. Balasis also testified that Mathis "showed some symptoms of being under the influence" of methamphetamine.

Balasis testified that it was possible that Wilhite was present during the incident, and remained at her residence after Mathis left [to obtain Ledlow's car]. Balasis noted the path from the back part of the house to the chicken coop appeared to have been raked. Moreover, he testified that a suitcase containing multiple shotgun shells, a scope, a bandoleer or shotgun holder, and yellow nylon rope was found under Wilhite's bed; additional boxes of shotgun shells were also present under the bed. Finally, a shotgun shell, a piece of rope, and a yellow cleaning glove were found in Wilhite's trashcan.[6]

Dr. Greg Pizarro of the Kern County Sheriff-Coroner's Office was the prosecution's final witness. Pizarro performed an autopsy on Torres's body on January 31, 2012. The body had 49 separate bruises or injuries. The injuries included a laceration behind the right ear; abrasions and contusions on the body; bleeding in the back of the brain (which is usually caused by falling and hitting the head); and a subdural hemorrhage (also caused by hitting the head). The body also had a partial ligature impression on the left side of the neck, indicating that something was tied or wrapped around the neck. When the body was taken out of the body bag, it had a blue covering over the mouth, nose, and part of the face, and the hands, feet, and neck were tied

---

**6** Defense counsel had noted, during a discussion outside the presence of the jury, that Wilhite gave a statement to Detective Balasis that was documented in a police report. Wilhite told the detective that there was a shotgun at her house but it was kept under her bed or a couch and was not used in the altercation. Counsel added that Wilhite told the police that Ledlow had taken the shotgun from her house. Wilhite had stated that Ledlow took the gun to return it to its original owner, an Indian male friend of Torres's. (Wilhite was possibly referring to Jacob Potochnik, Torres's best friend, who independently told the police that a few days before Torres was killed, he gave Torres a shotgun to keep at Wilhite's place.)

relatively tightly by a rope. There was also a purple scarf or piece of clothing "in the neck"; and the body was tied with two different types of rope, including yellow rope.

Pizarro identified "multiple blunt force injuries" as the cause of death for purposes of Torres's death certificate; he also listed multiple blunt force injuries as the cause of death in his autopsy report, which he signed on June 14, 2012. However, in his "final summary" he wrote that Torres died "as a result of a combination" of multiple blunt force injuries, asphyxiation, and "a lethal level of methamphetamines." Pizarro also testified that blunt force injuries, asphyxiation, and methamphetamine intoxication were all substantial factors in causing Torres's death.

Pizarro testified that the level of methamphetamine in Torres's system was 200 times higher than the level that would be lethal. Torres also had alcohol and marijuana in his system.

As for asphyxiation, Pizarro described it as the loss of oxygen to the brain caused by compression of the carotid artery, which carries oxygenated blood to the brain. Pizarro said his finding that Torres was asphyxiated was not based on an actual evaluation of loss of oxygen to the brain, as the relevant tests were not conducted in this case. Instead, Pizarro's conclusion was premised simply on his visual observations that the covering on Torres's mouth and nose would have blocked his breathing, and that the rope around his neck was tight enough to restrict blood flow to his brain. Pizarro later clarified his findings: Torres was not asphyxiated by smothering or any restriction of air flow to the lungs; rather Torres was asphyxiated by compression of his carotid artery by the rope, which cut off the supply of oxygenated blood to the brain. On cross-examination, Pizarro admitted that he did not note any compression of Torres's carotid artery during the autopsy; nor did he see any signs of loss of oxygen when he examined Torres's brain. Pizarro also conceded it was reasonable to conclude the rope was placed around Torres's neck after his death. Pizarro noted that, in contrast, Torres clearly sustained the blunt force injuries to his body while he was alive.

26.

In closing argument, the prosecutor contended that Mathis was guilty of first degree murder by causing blunt force trauma to Ruben Torres, asphyxiating him, and force-feeding methamphetamine to, and intentionally overdosing, him. Regarding the motive, the prosecutor argued to the jury as follows: "Motive. Motive. Rod Bethell told you the motive. Danny Mathis was jealous. He was jealous because his girlfriend had found a new lover. A new man. A new guy in her life and moved him in. That's the motive. He wanted to get revenge for that. He wanted to eliminate that man."

As for evidence to support the contention that Mathis acted with deliberation, premeditation, and malice aforethought, the prosecution again relied on Bethell's recorded interview with Detective Balasis, in which Bethell stated that not long before the fatal attack, Mathis told Bethell that he wanted to kill Torres.

*The Defense Case and Argument*

The defense presented a number of theories based on the central contention that Mathis did not act with malice, or deliberate and premeditate, in killing Torres.[7] After the jury was instructed on first and second degree murder, self-defense, voluntary manslaughter based on both heat of passion and imperfect self-defense theories, involuntary manslaughter, battery, and false imprisonment, the defense argued as follows:

> "Well, go back to Ruben's—to Danny's own statement[s] throughout the interview. Danny had made it clear to law enforcement during that interview that all he wanted to do was he intended on kicking his ass, beating him up, slapping him around, teaching him a lesson. And at no point did he say, you know, I really wanted to kill him. I planned on killing him.

---

**7**      The defense also called Rodney Bethell as its only witness. Bethell testified, outside the presence of the jury, that Torres told him he had procured a shotgun to protect himself from Mathis. The judge precluded counsel, on hearsay grounds, from asking Bethell about the shotgun in front of the jury.

27.

"[A]s a matter of fact, he says, I didn't want to kill him. He says, I fucked up. He had no intent to kill at the time of the act. That's required, ladies and gentlemen, by the law. You have to have the intent at the time of the act together, and that wasn't here. He did not intend to kill him. He did not intend to murder him. He wanted to teach him a lesson. Teach him a lesson for sleeping with Chasidy, for calling her a whore, for bragging about it, for stealing from her. That was his intent at that time. [¶] … [¶]

"Danny could have done a lot of things that perhaps you or I could have done. Calling the cops. Not tying him up. Any of that. But that's not Danny's world. That's not how Danny was reacting at the time. That's not how Danny was thinking. At the time when this happened, Danny had a shotgun in his face and he went berserk. And he punched someone. And we know there were injuries caused. He didn't know if the person was alive or not, so the person was tied up. He didn't want the person to get up or leave. [¶] … [¶]

"… But he also said when he tied him, he wasn't tying up to kill him. He just wanted him not to get up and call the cops on him. Yeah, he was scared. I beat the guy up. Doesn't know how self-defense works. Doesn't know the law. He doesn't know what the cops are going to think. What they're going to blame him for. What they're going to say about the incident. He doesn't know. He's worried. It's normal. It's normal to panic, to be scared. It's a normal human feeling, but the issue is still did he intend to kill Ruben? Did he intend to kill him at the time that he took on any action?"

The defense contended that Mathis did not commit first degree murder, but rather acted in self-defense because he had a shotgun pointed at him. The defense further contended that the jury could find that Mathis was provoked into killing Torres in the heat of passion, and, consequently, was guilty of voluntary manslaughter, not murder. The defense posited two alternative theories of provocation: (1) that Mathis was provoked by the shotgun pointed at him, and (2) that, during the fight, he was provoked by Torres bragging about "doing" Wilhite given that he had felt jealous of, and disrespected by Torres, for some time. However, the defense focused on the theory that Mathis was provoked by having a shotgun pointed at him, and, as a result of the provocation, had acted rashly and under the influence of intense emotion that obscured his reasoning and judgment. Counsel argued, "[t]he provocation would have caused a

person of average disposition to act rashly and without due deliberation[,] that is from passion rather than judgment." Counsel added, "I think it's safe to say that if a reasonable person had a shotgun in their face or any type of firearm, they are not going to be deliberating how to act. They will act. And they will react swiftly. And that reaction might be dangerous to the other person, but, again, so be it."

The defense relied on Mathis's statement to the police as evidence that Mathis had acted in self-defense and/or in the heat of passion as a result of Torres's actions. However, as discussed below, throughout the trial the defense sought to introduce other evidence to corroborate Mathis's statement that he had beaten Torres as badly as he did because Torres tried to shoot him with a malfunctioning shotgun, including testimony by Jose Pineda about Wilhite's involvement and Torres's use of a shotgun during the incident. Ultimately, none of this evidence was admitted for the jury's consideration. In both his opening and closing arguments, the prosecutor highlighted the lack of any evidence to corroborate Mathis's claim that Torres had tried to shoot him with a shotgun.

### *Jury Questions*

During deliberations, the jury sent several notes to the judge. The first note stated: "Ask the judge what instruction applies to the 1st Degree Murder or 2nd degree or Both? In Regards to Malice of Aforethought [*sic*]. (Instruction # 520)." The jury subsequently sent a second note, which stated as follows: "We are not able to agree on 1st degree murder." The judge admonished the jury to continue with deliberations. Thereafter, the jury sent a third note to the judge, with three separate questions: (1) "Are crimes of passion that result in death considered 1st degree murder?"; (2) "If someone commits murder while under the voluntary influence of drugs can that person be considered for 1st degree murder conviction?"; and (3) "We need clarification about what constitutes premeditation." The judge responded to the jurors' questions after input from both counsel.

## LEGAL ISSUES

### I. EXCLUSION OF JOSE PINEDA TESTIMONY ON WILHITE DECLARATION

Through the testimony of Jose Pineda, the defense sought to introduce self-incriminating statements that Wilhite made to Pineda at a time when they were engaged in a sexual relationship. According to Pineda, Wilhite told him she had "set Torres up" for the beating because she wanted to get back at him for stealing from her; she called Mathis to her residence when Torres was present; she gave Torres an inoperable shotgun so Torres would provoke Mathis by trying, in vain, to shoot him; she actively participated with Mathis in beating Torres; and she tied Torres up and gagged him after the beating.

The defense contended Wilhite's statements were admissible as statements against her penal interest under Evidence Code section 1230, but the trial court excluded Pineda's proffered testimony in its entirety. This was error.

A party who contends that an out-of-court statement is admissible as a statement against penal interest must show "that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 607 (*Cudjo*).)

The trial court excluded Pineda's proffered testimony because it did not find the declaration sufficiently trustworthy. However, the court did not apply the proper legal principles in evaluating the declaration's trustworthiness. First, the court improperly considered the credibility of Pineda, the in-court witness through whom the declaration was offered. (*Cudjo*, *supra*, 6 Cal.4th at p. 608 [in ruling on admissibility of declaration against penal interest, court cannot consider credibility of in-court witness through whom declaration is offered].) Second, the court failed to consider any of the established factors that are relevant to an assessment of the trustworthiness of a declaration against penal interest. (See, e.g., *People v. Greenberger* (1997) 58 Cal.App.4th 298, 334

(*Greenberger*) [court *must* look to totality of circumstances in which offered declaration was made, including whether declarant spoke from personal knowledge, the possible motivation of declarant, and what was actually said by declarant].) Finally, the court failed to hold a hearing under Evidence Code section 402, as requested by the defense, to obtain evidence regarding the circumstances surrounding the declaration.

Because the court did not correctly apply the relevant legal principles in evaluating the declaration's trustworthiness, the court's exclusion of the declaration as untrustworthy constituted an abuse of discretion. (See *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298 ["[a]ction that transgresses the confines of the applicable principles of law is outside the scope of discretion" and constitutes an abuse of discretion]; *People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 742 ["Where the trial court's decision rests on an error of law … the trial court abuses its discretion."].) Even if the court had properly applied the governing standards, it could not reasonably have concluded that the declaration was untrustworthy, based on the existing record, without receiving evidence through an Evidence Code section 402 hearing to support its conclusion.

Furthermore, the court's error was prejudicial and requires reversal of Mathis's conviction. Had it been admitted, the declaration would have corroborated the lynchpin of Mathis's defense, i.e., that he beat Torres severely because Torres blindsided him with a shotgun; at the same time, it would have undercut the prosecution's theory that Mathis acted with deliberation and premeditation, and, consequently, was guilty of first degree murder.

A.    *Background*

On October 2, 2013, Tai Scott-Welch, a defense investigator, contacted Pineda at Central Receiving Facility in Bakersfield.[8]  Scott-Welch obtained a statement from

---

[8]    Trial testimony began on October 2, 2013.

Pineda and memorialized it in a report of the same date. The next day, the defense proffered the investigator's report to bolster its request to call Pineda as a witness. The report stated, in its entirety, as follows:

> "On October 2, 2013, I contacted Jose Pineda at Central Receiving Facility (CRF). I identified myself as an investigator with the Public Defender's Office, and explained that our office is representing Danny Mathis. Pineda agreed to be interviewed.

> "Pineda explained that he knows Chasi[d]y Wilhite. He indicated that they met while he was incarcerated at Wasco State Prison and she worked as a pharmacy technician. Pineda said after he was released from prison and Wilhite no longer worked at the prison, they began a sexual relationship. Their sexual relationship continued on and off for some time. Eventually, Pineda called off the relationship. Pineda was incarcerated again during the time of R[u]ben Torres' death. Wilhite wrote Pineda letters and after his release they began their sexual relationship again.

> "Pineda stated that Wilhite confided in him while they were doing drugs and sleeping together. He indicated that Wilhite admitted to him that she set Torres up. Pineda explained that Wilhite told him she had a shotgun that she knew did not work proper[l]y. She called Mathis to her residence when Torres was present. Pineda stated Wilhite told him she gave the shotgun to Torres, and Torres pointed it at Mathis and pulled the trigger anticipating that it would fire proper[l]y. Pineda said Wilhite knew that Mathis would also think that the shotgun would fire. Wilhite explained to Pineda that Mathis beat Torres for threatening him with the shotgun and attempting to shoot him, but she also hit him and was responsible for getting the rope, tying Torres, and gagging him. Wilhite also cleaned the chicken coop. Pineda said Wilhite wanted to get back at Torres because she was informed he was stealing from her.

> "Pineda explained he has never come forward with this information because of his own reputation."

The defense sought to introduce Wilhite's declaration to Pineda as a statement against penal interest, arguing that Wilhite was unavailable because she had failed to comply with a defense subpoena and a court order to appear as a witness. The court addressed the admissibility of Pineda's statement to the investigator as follows:

"[THE COURT:] … I did have the opportunity over the lunch hour to re-read a copy of the investigative report regarding Jose Antonio Pineda, which you gave me a copy of, dated October 2nd, by Tai Scott-Welch, an investigator from … the Public Defender's Office.

"If you can give me a heads up of what you are planning to do at this time, Mr. Mattaeo,[9] perhaps I could give some indicateds {*sic*} that might help you in making a decision.

"MR. MATTAEO: Well, Judge, we would like to be able to call Mr. Pineda to the stand and question him about the statements that he provided to my investigator. [¶] … [¶]

"THE COURT: All right. Regarding Jose Antonio Pineda's testimony, Mr. Mattaeo, is it going to be substantially what is reported here on the statement by Investigator Welch?

"MR. MATTAEO: That is the only information that I have received or I am aware of. So that is the only information I will be pursuing to get out of Mr. Pineda."

The prosecutor requested a hearing under Evidence Code section 405 to determine whether Wilhite was unavailable.[10] The prosecutor also stated that, as a secondary matter, the court would have to evaluate the trustworthiness of the statements and "must examine it under a 352 standard" but that the court "still must first get past the 405 burden." The court responded, "Well, do we need to get that far, Mr. Green,[11] if the Court feels that Pineda's testimony as to what Wilhite told him is hearsay?" The prosecutor stated, "Well, we believe it is hearsay, Your Honor. So we're objecting to it on that basis."

---

**9**     Jano Mattaeo was defense counsel for Mathis.

**10**     Our Supreme Court has indicated that the court may also hold a hearing pursuant to Evidence Code section 402 to establish preliminary facts relevant to the admissibility of evidence offered under Evidence Code section 1230. (See *Cudjo*, *supra*, 6 Cal.4th at p. 604.)

**11**     Kenneth R. Green represented the People in this matter.

The court then read into the record, Wilhite's declaration to Pineda, as documented in the investigator's report. Next, the court stated:

"I can't see a reason to have that testimony come in other [than] for the truth of the matter … asserted in the statement; that is, Wilhite did all of these actions for the statements she made, in order to get back at Torres because he was stealing from her, and to set the situation up.

"Clearly, the prosecution would want to cross-examine Wilhite regarding her participation in this particular matter.

"I don't see any way around this as a hearsay exception or a non-hearsay use. I anticipate Mr. Mattaeo will make the same argument he's made with previous witnesses who are not here. And the indicia [of] reliability, once again, is an issue. I think Mr. Green has hit the nail on the head there.

"*If this was indeed the case, any defendant could make a statement and then have one of his buddies come in to corroborate it. Nonetheless still hearsay.*

"We need to hear from Wilhite. We needed to hear from other witnesses you had, Mr. Mattaeo. Unfortunately, you don't have them. I don't see a hearsay exception or non-hearsay use.

"So I'm going to rule that the testimony here by Pineda as to what Wilhite told him is hearsay and excluded." (Italics added)

Defense Counsel then had the following exchange with the court:

"MR. MATTAEO: Your Honor, I don't believe the entire report can be deemed hearsay without an exception. I believe there are statements in there that come within a declaration against penal interest, and should come out.

"If Mr. – and with regards to unavailability, if Mr. Green wants to take the position that Wilhite is available, then I'm going to ask him right now to provide us where her whereabouts are.

"THE COURT: Well, let me ask you this, Mr. Mattaeo. Let's assume we're in a trial and anybody who is unavailable – so let me back up.

"*Let's just say we have defendant X is on trial and witness A gives a statement to somebody that I did it, not the defendant X. You mean to tell*

34.

*me that that statement from witness A is going be admissible as a declaration against interest?*

"MR. MATTAEO:  I believe Miss Wilhite says I am the one, that I beat up Ruben, I tied him up and gagged him.  I believe that would be against her penal interest if she –

"THE COURT:  *So any time somebody who is unavailable to come to court states that they did the crime, that should be admitted as a declaration against interest.  So what would prevent in every criminal trial a witness coming in who nobody knows about and testifies through a third party, i.e., hearsay, that they did it?  How would we possibly cross-examine that person?*

"MR. MATTAEO:  Because the prosecution has the opportunity to be able to cross-examine Mr. Pineda.  They can cross-examine Mr. Pineda about what –

"THE COURT:  But they can't cross-examine the declarant, which is Wilhite.

"MR. MATTAEO:  I agree, Judge.  But that's why it's an admission against penal interest, Judge.  It's not any different than bringing in statements that Mr. Mathis has said to law enforcement and bringing it out and saying, well, hey, we're just going to bring it out and it is what it is.  We don't need to cross-examine him.  We don't need to do anything.  And if he wants to take the stand, that's a different story.  That is the whole purpose of declaration against interest.  It's a statement made against someone's penal interest or pecuniary interest, and the essence of it is it would … be reliable and trustworthy because people don't say those things unless they, in fact, did them.

"I don't go walking around saying I killed somebody just for the sake of saying I killed someone.  People don't say that.

"So if she, in fact, has made a declaration against her interest, against her penal interest, and decided to tell Mr. Pineda, hey, I beat up Ruben and I tied him up and gagged him, that is certainly against her penal interest, because she obviously committed something with regards to this incident.  She had involvement.  She participated.  She was involved and present.

"And the evidence already shows that there is – we know that Chasidy Wilhite's name has [come] up numerous times throughout this

35.

trial. We know that she is present during this incident, whether it's through Mr. Mathis or whether it's through Miss Dawson who said … she dropped Sharon over at Chasidy's on Saturday after Mr. Mathis returned.

"So if Chasidy decides to confide in Mr. Pineda and say – make a statement that she participated or committed something within this crime, then it should come out.

"Now perhaps the Court does find certain other statements in the report as far as *why* she gave the shotgun or the fact that – what her state of mind was, might be an issue. That's something that we can address. But statements that directly implicate her are – are against her penal interest.

"And I also believe that her statement that she gave a shotgun that she knew was not working is important to this case because it raises an issue of whether she tried to set up the defendant and the victim.

"Mind you, this issue of setting the defendant up came out from law enforcement during the interview of Mr. Mathis. They questioned about whether Chasidy tried to set up the defendant or tried to have some involvement in it. And that would certainly explain, if that is the case, why law enforcement was also questioning her motive or her involvement in this case. But more importantly would explain why she's unavailable.

"People run from subpoenas. People run from the Court when they've had – been involved in a crime and they don't want to answer for it.

"If Miss Wilhite was not involved in this crime, then she certainly would have been here. Certainly the prosecutor would have been able to bring her in to testify and say that Danny Mathis is completely wrong. That there was no shotgun. That Danny Mathis was the person who was the aggressor and the person who attacked.

"But in this case Chasidy Wilhite is not here. She's not available.

"And certainly the Court can take into consideration that people make themsel[ves] unavailable or evade court proceedings when they're involved.

"We have made attempts to do our due diligence in procuring Miss Wilhite. She was subpoenaed. She was in court at some point. And after that, she disappeared.

"And if Mr. Green believes that she is available, then I'm going to ask what address does she have or where her availability is and how he

knows that, and I'll be happy to have an investigator go out and serve her right now or we can just have law enforcement go and pick her up.

"THE COURT: *Well, Mr. Mattaeo, it appears that Pineda told your investigator that he has never come forward with this information prior to October the 2nd, 2013.*

"MR. MATTAEO: Yes. Because of his reputation.

"THE COURT: *This case happened on January the 28th, 2012.*[12]

*"So how can I find that to be sufficiently an indicia of reliability?*

"MR. MATTAEO: *He's also been incarcerated for a while. He's not just walking around on the street.*

*"Again, if the Court wants to do a 402 hearing, he is present. Mr. Math – Mr. Green can get up and question about those statements and how he gathered those statements and why he didn't come before. And he can certainly explain that.*

*"If he was not around, if he was scared for some reason – for all I know maybe he was scared of Chasidy. Chasidy could be some dangerous human individual. I don't know. I never had any contacts with her, as far as besides having her appear in court. I don't know what she's like. Maybe he's afraid of her. Maybe she knows people. Maybe he's afraid of that.*

*"There's a lot of reasons why he didn't come forward.*

*"But that's something for the jury to decide, too.*

"THE COURT: *Not true. The heart of the declaration against interest exception is the basic trustworthiness of the declaration and that question is left to the trial court's discretion ….*

"MR. MATTAEO: *We certainly can have a 402 hearing and the Court can find out why, if any, he did not bring this information before.*[13] *Where he was.*

---

**12**   The investigator's report does not state when Wilhite made the statement to Pineda.

"THE COURT:  Mr. Green.

"MR. GREEN:  Yes, Your Honor.  First, I want to start off with the fact that this statement was given October 2nd of 2013.  There is an important – that day's important for yet another reason.  That is the day that Mr. Pineda was moved into the cell two doors down from Mr. Mathis in the exact same cell block.  He was moved in the morning.  He gave the statement, I believe, in the afternoon.  That is what I've been told from my investigating officer who is getting the records.

"In addition, Mr. Pineda explains that he met Miss Wilhite while he was incarcerated at Wasco State Prison and that she worked as a pharmacy technician there.[14]

"Detective Kavin Brewer has gone out there, and they indicated that she – Miss Wilhite never worked there.

"DETECTIVE BALASIS:  It was me.

"MR. GREEN:  Oh, Mr. Balasis went out there.  I'm sorry.

"DETECTIVE BALASIS:  And I spoke to him.

"MR. GREEN:  They indicated that never had anyone with that name or Social Security number that ever worked there.

"In addition, the focus of the declaration against exception – or against interest exception is the basic trustworthiness of the declaration.

"Mr. Pineda did not – or *Mr. Mattaeo did not explain that Mr. Pineda had been in custody ever since this incident, and if he had been in custody ever since this incident, wouldn't he have numerous opportunities to explain this?*

"My understanding is that the investigator from the Public Defender's Office went out there on September 30th.  We don't have a report of what was discussed then.  But we do have a report that was dated October 2nd, apparently, when she went back out there.

---

**13**    The trial court may hold a hearing pursuant to Evidence Code section 402 to establish preliminary facts relevant to its resolution of the admissibility of evidence offered under Evidence Code section 1230.  (See *Cudjo*, *supra*, 6 Cal.4th at p. 604.)

**14**    The record reflects that Wilhite's grandparents lived in Wasco and that she had lived with them at some point.

*"I don't know what was discussed September 30th.*

*"So, again, that's indicia of unreliability. This is a made-up story. He came forward with this while we're halfway through trial.* I don't know how long Mr. Mattaeo has been talking to him. But it – Mr. Pineda indicated that he had been trying to help Mr. Mattaeo find Chasidy. And had actually had telephonic conferences with Mr. Mattaeo. *You would think if he's trying to find Chasidy, he would at least know the reason why. And if he knew the reason why, why wouldn't he have told them during those instances*….

"If I wanted Miss Wilhite here, I would have used all our resources. I can't say that I would have gotten her here. People run for different reasons. She might run because she's afraid of this man who killed her boyfriend in front of her. And then who remained at her house. That is a reason why you might want to be found by Mr. Mathis. You might not want to be found by Mr. Mathis. You might not want to have Mr. Mathis or his friends know where you live.

"*So we would argue the indicia of unreliability. It has not been met*, and the confrontation clause would be improperly – or we would not have the right to – our rights under confrontation clause, so we would be prejudiced.

"Thank you, Your Honor.

"MR. MATTAEO: Judge, Miss Welch did go out and try to make attempts to speak to Mr. Pineda on the 30th. Perhaps she could not do that because she went to CRF and she was told that she would not be able to see him at the time due to they were making a count or whatever.

"She tried to make attempts on the 1st, again at Central Receiving Facility. Again I would point to the Court when she met with Mr. Pineda, she did not meet with Mr. Pineda down at Lerdo. She met with him here at Central Receiving Facility. She was advised he had a court case. I believe in Shafter. She would not be able to talk to him, as he was being transferred out there.

"So it was not up until the 2nd when she met him. That was at Central Receiving Facility. I am not aware that when she talked to Mr. Pineda that Mr. Pineda was housed anywhere near Mr. Mathis at Lerdo.

"If anything, Mr. Pineda most likely was housed with Mr. Mathis after we got the statement from him and not before. Because, again, they

spoke to him at Central Receiving Facility, and we're not aware that he was in Mr. Mathis's pod prior to that.

"*As far as whether, again, any of the statements that were made by Mr. Pineda are credible, that … can be obtained through cross-examination. And Mr. Green will have the opportunity to cross-examine him, whether that's through a 402 hearing or if the Court allows it to be heard by the jury.*

"*Why he didn't provide it before, again, that's something that Mr. Pineda can be able to answer. I can't come up with his own reasons. I can only speculate as to any number of reasons.* And, again, one of them can be incarceration. He does have a record, and I'm sure Mr. Green is aware of it.

"But I do believe that some of the statements in that report are against Miss Wilhite's penal interest and may not be everything that is said in that report, but there are certainly some statements in there that are against her penal interest.

"And as far as her availability, we have continued to do our due diligence in trying to locate her, but we are unable to locate her.

"And as I've indicated to the Court, she was subpoenaed. She had shown up to the court, and after that, she has made herself unavailable to us, by all means, and by finding her at – any of her last known addresses that she had provided to us in order to contact her. [¶] … [¶]

"*With that in mind, I would ask the Court to allow the defense to be able to at least have a 402 hearing and allow the Court to make a decision after questioning Mr. Pineda with regards to the statement.*" (Italics added.)

The parties submitted their arguments and the court ruled as follows:

"THE COURT: Mr. Mattaeo, based on the – the face of the document by Tai Scott-Welch October 2, 2013, I don't find that there is a basic trustworthiness of the declaration.

"I don't find the necessary indicia of reliability there simply based on the face of the document. Number one.

"Number two, over and above that, Mr. Green has informed the Court that some of the statements made in this report are false, regarding where Wilhite worked and where she didn't, number one.

40.

"And number two, the fact that he sat on this information – apparently, the crime happened in January of 2012. He sat on this information until October of 2013, and made the statement, apparently in the afternoon, after he had been moved a door down or two doors down from the defendant in the local jail. That is not exactly indicia of reliability.

"My previous ruling stands. The testimony of Pineda as to what Wilhite told him will not be allowed."

B.       *Analysis*

Evidence Code section 1230 provides, in relevant part, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made … so far subjected him to the risk of … criminal liability … that a reasonable man in his position would not have made the statement unless he believed it to be true." "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) Here the trial court excluded Wilhite's declaration, as set forth in the defense's offer of proof, on the basis that it was not sufficiently trustworthy to warrant admission. The trial court's determination on this issue is reviewed for abuse of discretion. (*Cudjo*, *supra,* 6 Cal.4th at p. 607.) "Of course, we review the specific determinations underlying the court's ruling under the standards appropriate thereto." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1251, citing *People v. Louis* (1986) 42 Cal.3d 969, 986 [conclusions of law are subject to de novo review].)

*Wilhite was unavailable and the declaration was against her penal interest.*

As an initial matter, we note the People do not dispute that Wilhite was unavailable when the court made its ruling; accordingly we assume she was unavailable, for purposes of our analysis regarding the admissibility of her declaration.[15]

---

[15]     A person is unavailable as a witness if he is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable

41.

We further note that the declaration the defense sought to introduce was a statement against Wilhite's penal interest. (See *People v. Jackson* (1991) 235 Cal.App.3d 1670, 1678 [the test to determine whether a statement is against the declarant's penal interest is "an objective one—would the statement subject its declarant to criminal liability such that a reasonable person would not have made the statement without believing it true"].)

In the declaration at issue, Wilhite stated that she "set Torres up" for a confrontation with Mathis by calling Mathis to her residence when Torres was present; she gave Torres a shotgun she knew did not work properly so Torres could use it against Mathis; she then participated with Mathis in a deadly assault on Torres that ensued when Torres pointed the gun at Mathis, pulled the trigger, and the gun failed to fire. These statements reveal that Wilhite aided and abetted, and possibly conspired to commit, the assault on Torres. (See *Greenberger*, *supra,* 58 Cal.App.4th at p. 340 [trial court properly found penal interest exception applied to codefendant's statement that "'I'm the one who set the whole goddamn thing up'" as well as to other statements describing the crime, as they showed that declarant was aider and abettor and coconspirator; admission that codefendant set up the crime was disserving and helped to establish the reliability of other parts of the declaration], *United States v. Paguio* (9th Cir. 1997) 114 F.3d 928, 933-934 [absent witness's statement to effect that he led others into wrongdoing was admissible as statement against penal interest].)

_____

to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) Here, Wilhite was subpoenaed by the defense. After she failed to show up, counsel requested and obtained a $25,000 body attachment and bench warrant. She subsequently came to court and the court ordered her to return at a given time. She never returned; the bench warrant remained outstanding. The prosecutor noted in a motion in limine filed with the court that "Ms. Wilhite has gone into hiding and has not been located by either the People or the Defense." The defense contacted Wilhite's family members but could not locate her.

Similarly, Wilhite's statements that she hit Torres along with Mathis and that she was responsible for getting the rope, tying Torres up, and gagging him, also constitute statements against her penal interest as they incriminate her in a number of crimes, such as murder, battery, false imprisonment, accessory, and conspiracy. The same is true for her statement that she cleaned the chicken coop, as it implicates her as an accessory after the fact and coconspirator. Finally, Wilhite's statement that she wanted to get back at Torres because he had been stealing from her, considered in conjunction with the other statements in her declaration, also cuts against her penal interest. It further reveals a motive for the actions described in the declaration, thereby bolstering the reliability of the declaration as a whole. (See *People v. Tran* (2013) 215 Cal.App.4th 1207 [hearsay declaration as a whole was contrary to declarant's penal interest when constituent statements were viewed together and in context].)

Thus, the entirety of Wilhite's declaration counts as a statement against her penal interest. (See *People v. Grimes* (Aug. 22, 2016, S076339) ___ Cal.5th ___ [pp. 19-22] [2016 Cal. LEXIS 6976] [endorsing contextual approach in evaluating statements offered under the against-interest exception, which permits admission even of collateral statements that, though not independently discerning are inextricably tied to a specific statement against penal interest].) The People's argument that the declaration should be viewed as exonerating Wilhite, because she actually had a greater role in the killing than she admits in the declaration, is unpersuasive; it also contradicts the prosecution's theory at trial that depicted Mathis as the sole perpetrator. The People cannot have it both ways. In sum, the trial court should properly have found that Wilhite's declaration subjected its declarant to criminal liability such that a reasonable person in Wilhite's position would not have made the declaration unless she believed it to be true. (See *People v. Jackson*, *supra,* 235 Cal.App.3d at p. 1678.)

43.

*The trial court improperly evaluated the declaration's trustworthiness.*

The trial court's ruling on the trustworthiness of the declaration is the focus of our analysis. The trial court ruled, in effect, that Wilhite's declaration to Pineda was *not* "sufficiently reliable to warrant admission despite its hearsay character." (*Cudjo*, *supra*, 6 Cal.4th at p. 607.)

*Cudjo* explained the rationale as to why courts must assess the trustworthiness of hearsay declarations offered under one of the hearsay exceptions:

> "Hearsay is generally excluded because the out-of-court declarant is not under oath and cannot be cross-examined to test perception, memory, clarity of expression, and veracity, and because the jury (or other trier of fact) is unable to observe the declarant's demeanor. [Citations.] Because the rule excluding hearsay is based on these particular difficulties in assessing the credibility of statements made outside the jury's presence, the focus of the rule's several exceptions is also on the reliability of the out-of-court declaration. Thus, the various hearsay exceptions generally reflect situations in which circumstances affording some assurance of trustworthiness compensate for the absence of the oath, cross-examination, and jury observation. [Citation.] Neither the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury." (*Cudjo*, *supra*, 6 Cal.4th at p. 608.)

When evidence is offered under one of the hearsay exceptions, such as the exception for statements against penal interest, the trial court must determine as preliminary facts (1) "that the out-of-court declarant made the statement as represented," and (2) "that the statement meets certain standards of trustworthiness." (*Cudjo*, *supra*, 6 Cal. 4th at p. 608.) In the instant case, the trial court applied the wrong standards in determining whether the declarant made the statement as represented *and* whether the statement had the requisite indicia of reliability. Accordingly, as explained in more detail below, the court's ruling was an abuse of discretion.

a. *Whether the declarant made the statement as represented*

The first determination the trial court must make in evaluating the trustworthiness of a declaration against penal interest—whether the declarant made the statement as

44.

represented—is governed by the substantial evidence rule. (*Cudjo*, *supra*, 6 Cal.4th at p. 608.) "The trial court is to determine only whether there is evidence sufficient to sustain a finding that the statement was made. [Citation.] As with other facts, the direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' [Citations.] Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest. [Citations.]" (*Id*., at pp. 608-609.)

Here the defense offered, based on a written offer of proof, Pineda's testimony on the declaration made by Wilhite. The proffered testimony did not reflect a physical impossibility, nor was it demonstrably false on its face. The prosecutor asserted that Pineda's testimony was "a made-up story." The prosecutor further alleged that Pineda was not credible because he (1) waited over a year to come forward with the evidence; (2) made false statements as to how he met Wilhite; and (3) came forward only after he was moved to a cell near Mathis's cell in Lerdo. The court adopted the prosecutor's stated concerns. Specifically, the court noted: "it appears that Pineda told [the defense] investigator that he has never come forward with this information prior to October the 2nd, 2013. [¶] … [¶] This case happened on January the 28th, 2012. [¶] So how can I find that to be sufficiently an indicia of reliability?" The court also expressed its central concern about Pineda's proffered testimony as follows: "any defendant [can] make a statement and then have one of his buddies come in to corroborate it." (But see *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009 [court may not set itself up as gatekeeper excluding evidence based on its doubts about the credibility of live witnesses]; *People v. Alcala* (1992) 4 Cal.4th 742, 790-791 [court may not exclude evidence because it simply does not believe the testifying witness].)

45.

Although substantial evidence supported the conclusion that Wilhite made the declaration as represented, the court nonetheless excluded evidence of the declaration based on its own doubts about Pineda's credibility. The trial court applied the wrong standard—absent a finding that the offered testimony was demonstrably false, the court was required, in making its initial determination of preliminary fact, to apply the substantial evidence standard. Here, the record does not support a finding that Pineda's testimony regarding the declaration was demonstrably false. Accordingly, on this record, the court's failure to apply the substantial evidence standard in favor of conducting an assessment of Pineda's credibility, was an abuse of discretion.

b. *Whether Wilhite's declaration was sufficiently trustworthy*

When making the second determination—i.e., whether Wilhite's declaration is sufficiently trustworthy—the trial court assumes the declarant made the statement, and evaluates whether the circumstances, and the record, indicate the declarant was probably telling the truth when she made the statement. (See *People v. Cudjo*, *supra*, 6 Cal.4th at pp. 607-608; *People v. Duarte, supra,* 24 Cal.4th at p. 614.) *Cudjo* cautioned that, in assessing the reliability of a declaration against penal interest, the trial court must "focus exclusively," or at least "primarily," on the reliability of the *hearsay statement itself*. (*Cudjo*, *supra*, at p. 608.) The *Cudjo* court made clear that the "the credibility of the in-court witness," by contrast, "is not a proper consideration in this context." (*Ibid*.)

If a statement "'is truly against interest within the meaning of Evidence Code section 1230,'" it "'is sufficiently trustworthy to be admissible.'" (*People v. Geier* (2007) 41 Cal.4th 555, 584, overruled on another point by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305; see also *People v. Fuentes* (1998) 61 Cal.App.4th 956, 961-962.) However, "even when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. [Citations.]" (*People v. Duarte*, *supra*, 24 Cal.4th at p. 614.) Accordingly,

"the trial court *must* look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry."  (*Greenberger*, *supra*, 58 Cal.App.4th at p. 334, italics added.)

In this context, "the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others.…  However, *the most reliable circumstance is one in which the conversation occurs between friends* in a noncoercive setting that fosters uninhibited disclosures.  [Citations.]"  (*Greenberger, supra,* 58 Cal.App.4th at p. 335, italics added.)  Furthermore, a sufficient indicium of trustworthiness also may be found when an accomplice admits culpability and does not attempt to shift blame to another.  (*People v. Brown* (2003) 31 Cal.4th 518, 536-537.)

After hearing argument from both parties that was concerned *exclusively* with Pineda's credibility, the court ruled on the trustworthiness and, in turn, on the admissibility of Wilhite's declaration.  The court denied the defense's repeated requests for a hearing under Evidence Code section 402 so as to allow for the presentation of additional evidence concerning the circumstances of the declaration.  The court summarily found the declaration was not trustworthy and excluded Pineda's testimony in its entirety.  Specifically, the court stated, "based on the … face of the document by Tai Scott-Welch October 2, 2013, I don't find that there is a basic trustworthiness of the declaration."  The court further noted, "I don't find the necessary indicia of reliability there simply based on the face of the document."  Explaining its reasoning, the court added that, "Mr. Green has informed the Court that some of the statements made [by Pineda] in this report are false, regarding where Wilhite worked and where she didn't, number one.  [¶]  And number two, the fact that he sat on this information – apparently, the crime happened in January of 2012.  He sat on this information until October of 2013, and made the statement, apparently, in the afternoon, after he had been moved a door

47.

down or two doors down from the defendant in the local jail. That is not exactly indicia of reliability." The court concluded, "[t]he testimony of Pineda as to what Wilhite told him will not be allowed."

Once again the court applied the wrong standard in considering the declaration's reliability. First, the court did not *assume*, as required in determining this preliminary fact, *that the declarant made the statement*. On the contrary, the court focused on Pineda's credibility and the possibility that he had concocted the declaration.

Second, the court did not address the factors that a court must consider when assessing whether the statement, if made as claimed, was probably true. (*Greenberger*, *supra*, 58 Cal.App.4th at p. 334; *Cudjo*, *supra*, 6 Cal.4th at p. 607.) The court did not even consider whether the declaration was self-incriminating or whether it reflected an attempt "to shift the bulk of the blame to another," factors that can be determinative for purposes of assessing whether a declaration against penal interest is sufficiently reliable to warrant admission. (*People v. Brown*, *supra*, 31 Cal.4th at. p. 537; *People v. Geier*, *supra*, 41 Cal.4th at p. 584.) It did not consider whether the declaration was made during a "conversation … between friends in a noncoercive setting that fosters uninhibited disclosures." (*Greenberger*, *supra*, at p. 335.) It did not consider whether Wilhite was speaking from personal knowledge. (See *id*. at p. 334.)

Nor did the court consider whether Wilhite's declaration was consistent with other evidence in the record that was known to the court. (See *Cujdo*, *supra*, 6 Cal. 4th at pp. 607-608.) Instead, the court was only concerned with its doubts about Pineda's credibility, in direct contravention of our Supreme Court's directive that the exclusive, or at least primary, focus must be on the hearsay declaration itself. (See *id*. at p. 608.) Because we cannot say that the court's exclusive, or even primary, focus was on the content of and the circumstances surrounding the Wilhite hearsay declaration itself, the court's determination that the declaration lacked sufficient indicia of reliability was an abuse of discretion. (*Ibid*.)

Finally, we note that although the court stated that it found the declaration untrustworthy based on the face of Investigator Scott-Welch's report, applying the proper analytical framework outlined above, the court could not reasonably have concluded the declaration was *not* sufficiently trustworthy to be admitted. Nothing in the report automatically discredited the declaration and the court failed to hold a hearing under Evidence Code section 402 or 405 to receive relevant evidence to support its conclusion that the declaration was not trustworthy. [16] The court evidently did not think an evidentiary hearing was necessary as it had deemed Pineda a less-than-credible witness based on the "the face of the document" as well as on the prosecutor's bare arguments. This conclusion is supported by the fact that Pineda's credibility was the exclusive focus of the discussion on the admissibility of Wilhite's declaration. Although defense counsel tried to focus the argument on Wilhite's declaration, the prosecutor's argument and the court's comments were directed solely at Pineda's credibility. In any event, on the existing record, the court could not reasonably have concluded the declaration was not sufficiently trustworthy to be admitted.

Most importantly, Wilhite's declaration was facially trustworthy because it was purely self-inculpatory; it did not contain self-serving, self-exonerating, or blame-shifting elements to undermine its trustworthiness. (See *People v. Arceo* (2011) 195 Cal.App.4th 556, 576 ["statements genuinely and specifically inculpating the declarant provide particularized guarantees of trustworthiness"].) Indeed, rather than shifting blame onto Mathis or another person, by admitting she was the one who tied Torres up and gagged

---

**16** The defense requested an Evidence Code section 402 hearing on at least four occasions during its argument to the court. (See *Cudjo*, *supra*, 6 Cal.4th at p. 604 [court may hold hearing under Evidence Code section 402 in making preliminary fact determination of trustworthiness]; but see *People v. Jackson, supra,* 235 Cal.App.3d at p. 1678 ["The existence of circumstances which make the statement trustworthy is a preliminary factual finding made under [Evidence Code] section 405."].)

him, Wilhite took sole responsibility for asphyxiating him (which Dr. Pizzaro found was a contributing factor in Torres's death).

Another significant indicium of reliability, reflected in the offer of proof, was the fact that Wilhite and Pineda were lovers; Wilhite voluntarily and spontaneously admitted her culpability in the course of their sexual relationship. (See, e.g., *People v. Tran, supra,* 215 Cal.App.4th at p. 1220 ["the circumstance most indicative of reliability is where an incriminating conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"].) There is no reason to suggest that Wilhite would fabricate her involvement, or lie to protect Mathis, in the course of intimate conversations with Pineda, her new lover.

The fact that Wilhite spoke from personal knowledge also militated in favor of the declaration's reliability. (*Greenberger*, *supra*, 58 Cal.App.4th at p. 334.) Finally, the declaration was consistent with a considerable amount of other evidence in the record before the court. (See *Cujdo*, *supra*, 6 Cal. 4th at pp. 607-608.) We address this evidence in a separate section below, as it is relevant to both the declaration's reliability and its importance to Mathis's defense.

In sum, Wilhite's declaration had "the 'reasonable assurance' of veracity that ordinarily flows from a person's interest in not being criminally implicated," as well as additional confirmation of its reliability based on relevant circumstances. (*People v. Arceo*, *supra*, 195 Cal.App.4th at p. 577.) Since the court did not receive relevant evidence through an Evidence Code section 402 or 405 hearing, we conclude that, even had the court applied the correct standards and considered the proper factors, it could not reasonably have concluded that the declaration was not sufficiently trustworthy to warrant admission.[17]

---

**17** Here the court did not rule on the admissibility of Wilhite's declaration under Evidence Code section 352. Nor are we persuaded by respondent's argument that the court could properly have excluded the declaration on that basis. The declaration

We note that our Supreme Court has observed that courts should avoid "hasty conclusion[s]" about the reliability of evidence of third-party culpability, reasoning that "'if the evidence is really of no appreciable value no harm is done in admitting it; but if the evidence is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt.' [Citation.]" (*People v. Hall, supra,* 41 Cal.3d at p. 834.)

Having concluded the court erred, after a discussion of other evidence in the record that is consistent with Wilhite's proffered declaration, we consider whether the error was prejudicial.

### *Other Evidence Consistent with Wilhite Declaration*

Wilhite's declaration was consistent with a significant amount of evidence that was in the record before the court. Just like Wilhite's declaration, none of this evidence, which also provided critical corroboration of Mathis's defense, was ever presented to the jury. The reason for this, again, was the unavailability of the relevant witnesses, either by deliberate noncompliance with court orders or by reason of assertion of the Fifth Amendment's privilege against self-incrimination. We detail some of this evidence below as it not only bears on the reliability of Wilhite's declaration but also highlights the importance of Wilhite's declaration to Mathis's defense and is, in turn, relevant to the discussion that follows regarding whether the court's error in excluding evidence of the declaration was prejudicial. (See *Cudjo*, *supra,* 6 Cal.4th at pp. 607-608 [statement

---

provided critical corroboration for Mathis's defense and was clearly probative. Respondent argues that presentation of this evidence would require undue consumption of time. However, "courts must focus on the *actual degree of risk* that the admission of relevant evidence may result in undue delay, prejudice, or confusion." (*People v. Hall* (1986) 41 Cal.3d 826, 834, italics added.) We are not persuaded it is likely that any time required to cross-examine and/or potentially impeach Pineda would outweigh the probative value of this evidence.

against penal interest sufficiently reliable where it was generally consistent with other evidence in the record]; *Lunbery v. Hornbeak* (9th Cir. 2010) 605 F.3d 754, 761 [error to exclude statement against penal interest where it was critical to the defense and was corroborated by other evidence in the case].)[18]

*Sharon Ledlow's Statement to District Attorney's Investigators*

In the declaration at issue, Wilhite admitted culpability in Torres's killing by setting him up with an inoperable shotgun, hitting him, gagging him, tying him up, and cleaning the chicken coop. There was other evidence, from disparate sources, in the record before the court, that similarly connected Wilhite to the killing. First, the record reveals that it was Wilhite who called Sharon Ledlow and told her to look in the trunk of her car, leading to the discovery of Torres's body by Ledlow and Dawson. Detectives Balasis and Brewer also leveraged Wilhite's knowledge of the body's placement in the trunk to press Mathis to implicate her in the crime.

Next, Ledlow gave a recorded statement to the District Attorney's Office in which she said that Wilhite directly told her that she dealt the final, fatal blow to Torres.[19] The defense moved to have the recording of Ledlow's statement played for the jury because Ledlow had died (and Wilhite was unavailable and the statement was against her penal interest), but the recording was excluded as hearsay.

---

[18]    One of our sister courts of appeal has noted, in dicta, that "[i]n determining the particularized guarantees of trustworthiness, consideration of corroborating evidence is inappropriate since that would constitute 'bootstrapping on the trustworthiness of other evidence at trial.' [Citation.]" (*Greenberger*, *supra*, 58 Cal.App.4th at p. 336.) However, we follow our Supreme Court's *Cudjo* decision, which considered other evidence that was before the trial court in determining that a proffered statement against penal interest, if made as claimed, was probably true. (*Cudjo*, *supra*, 6 Cal.4th at p. 607.) In any event, the factors outlined above indicate that the trial court's ruling that Wilhite's declaration lacked sufficient indicia of reliability was unreasonable even without consideration of the record evidence.

[19]    Ledlow died from a terminal illness before the start of trial.

Wilhite's declaration that she cleaned the chicken coop after the crime is consistent with Detective Balasis's testimony that (1) the area leading from the backhouse to the chicken coop had been raked, and (2) Mathis had repeatedly denied that he had done any kind of cleaning after the beating.

Wilhite's admission that she gave an inoperable shotgun to Torres so as to provoke Mathis is consistent with other evidence that a shotgun was present at Wilhite's house at the time of the killing. Outside the presence of the jury it was revealed that Wilhite herself told investigating officers that a shotgun was kept in the house, but was taken by Ledlow.[20] Furthermore, shotgun shells, a scope, and a bandoleer were found under Wilhite's bed when it was searched after the discovery of Torres's body. A shotgun shell was also found in her trashcan.

Finally, Wilhite's statement that she had gagged and tied Torres up (he was found bound with yellow rope) is consistent with the fact that a bunch of yellow rope was found under Wilhite's bed. Mathis also stated, in more forthcoming parts of his police interrogation, that Wilhite had gagged and tied Torres up. Similarly, Mathis maintained, in various hearings leading right up to the start of trial, that Wilhite had gagged Torres and tied him up. He repeatedly pressed for DNA analysis of the rope and the gag, insisting that any DNA on the rope and gag would match only Wilhite's. His request for DNA analysis of the rope and gag was denied, based on a variety of adverse circumstances, by both the district attorney and the public defender offices.

*Wilhite's Statement to John Ruccinni*

Wilhite's declaration is also consistent with a separate statement she made to John Ruccinni, Ledlow's nephew, which the court found *was sufficiently trustworthy* to be admitted as a statement against Wilhite's penal interest. Ruccinni had recounted

---

**20**    Wilhite told the police the shotgun was not used in the incident. However, the reliability of the latter statement seems questionable as it is unlikely that Wilhite would incriminate herself directly to the police.

Wilhite's statement to a defense investigator. In the account, Ruccinni said he gave Wilhite a ride to Jacob Potochnik's residence at Ledlow's behest. Wilhite was carrying a backpack covered with dried dirt, as if it had been buried. The backpack contained a sawed-off shotgun; Wilhite stated the shotgun was used in a murder and she needed to get rid of it. Ruccinni helped Wilhite disable the shotgun to render it safe. The shotgun was later found in Ruccinni's vehicle and was taken into police custody.

Upon defense counsel's request, the prosecutor found this very shotgun by pulling the case related to it; his team took photographs of the actual gun and gave the photographs to the defense. Based on the photographs, Ruccinni identified the shotgun as the one that Wilhite had in her backpack on the night he gave her a ride. He was able to identify the gun from scratches/markings located near the numbers.

The trial court ruled that *Wilhite's statement that the gun was used in a murder and she had to get rid of it was admissible as a statement against her penal interest*.[21] The defense promptly called Ruccinni as a witness, to testify on Wilhite's statement. The court appointed independent counsel for Ruccinni because "Mr. Green feels he needs a lawyer," and held a hearing outside the presence of the jury to address preliminary issues related to his testimony.[22]

---

[21] This declaration, which the court determined *was admissible* as a statement against Wilhite's penal interest, is *less* incriminating in terms of Wilhite's personal role in the attack on Torres than Wilhite's declaration to Pineda, which the court excluded as hearsay. The court's rulings thus appear to be inconsistent. In both rulings, however, the court impermissibly considered the in-court witness's credibility.

[22] Regarding appointment of counsel, the prosecutor stated, "Your Honor, I believe Mr. Ruccinni may need to have independent counsel provided for him. He is a felon, and he's going to admit possession of a firearm, and he admits changing the firearm, disabling it, but he admits carrying it and working on it and eventually – and we would argue possessing it by doing those two items. He put it in his car. He drove it. And I think that he may need independent counsel because he is admitting to a felony. Earlier, the prosecutor had warned, "Your Honor, just so the record's clear, I'm not agreeing that I'm not going to pursue him or not – not myself personally, but someone within our office, should he admit that he had possession of a firearm as a felon. I'm not – I'm not

54.

In an effort to preempt invocation of the privilege against self-incrimination by Ruccinni, defense counsel told the court he would only ask Ruccinni about "[w]ho he had given a ride to and what his observations were, and that would be the extent of it." The prosecutor disagreed about the potential scope of Ruccinni's testimony, stating, "That's not the extent of it. *Mr. Ruccinni ended up with the self {sic} same shotgun that he alleged that Chasidy Wilhite had*. It was found in his vehicle. It was aban – it was his vehicle, but it had been abandoned. *He had the shotgun that he alleges belonged to Miss Chasidy Wilhite*."[23] (Italics added.) The prosecutor further stated, "So it is not some nebulous shotgun that's out there. [Ruccinni] identified it as being the same shotgun that

---

giving him immunity. I just want to make that clear." Finally, in his in limine motion to exclude Mr. Ruccinni's testimony, the prosecutor noted, "[b]y testifying to giving Chasidy Wilhite a ride and helping her with the shotgun, the witness is admitting all of the elements necessary to suffer a PC 29800 conviction."

[23]     The court had the following exchange with the prosecutor:

> "THE COURT: Well, was this shotgun ever found?
>
> "MR. GREEN:  Yes, Your Honor.  Whether it was used in this or not, *there was a shotgun found.*  [¶]  I would point out -
>
> "THE COURT: What did you say in your opening statement, Mr. Green, about a shotgun?
>
> "MR. GREEN: *I said there wasn't one found*, Your Honor.  You can go to my house and find a shotgun.  It doesn't mean it was used at the scene of the crime.  That's what – this shotgun that Ruccinni says Chasidy gave him is – there is no proof that it was at the scene of the crime, Your Honor.  [¶]  And, in fact, when we asked Mr. Ruccinni about the weapon and the fact that he had altered it, this is the exact quote from my investigator's report. John Ruccinni told us he would take the Fifth on that."

But the prosecutor, in his opening statement, had also stated, "[there is] nothing to indicate that Ruben Torres ever had a shotgun."

was found in [his] abandoned vehicle. We did not."[24] The prosecutor insisted he would cross-examine Ruccinni about the fact that the shotgun was ultimately found in his car, causing Ruccinni, who had a felony record, to invoke his Fifth Amendment privilege against self-incrimination.

The jury never heard from Ruccinni. Wilhite's statement that she needed to get rid of a shotgun that had been used in a murder never came to light. Nor did the fact that the shotgun Wilhite was trying to jettison had actually been located and was presently in police custody. Given the exclusion of this evidence, Wilhite's declaration that she had set Torres up with a faulty shotgun to provoke a fight with Mathis, as offered through Pineda, was all the more important to Mathis's defense.

### Jacob Potochnik's Statement to Police

Wilhite's declaration was also consistent with a recorded statement that Jacob Potochnik, Torres's best friend, gave to Detective Brewer. Potochnik confirmed that Torres had a shotgun he was unable to fire at the time he was killed. Potochnik told Brewer that a couple of days before Torres was killed, Potochnik purchased a shotgun "'off the street' for $100.00."[25] He sawed off the barrel of the shotgun and gave it to Torres as protection from Mathis.[26] Potochnik also said that Wilhite had called him at 3:30 a.m. to tell him that Torres was not able to fire the gun. Finally, Potochnik told Brewer that Ledlow currently had the gun; it was stashed behind her washer and dryer.

---

[24] Although the prosecutor asserted that the shotgun was found in Ruccinni's vehicle, defense counsel explained that the vehicle was not in Ruccinni's name and "might actually have belonged to Miss Sharon Ledlow."

[25] This quote is from a motion in limine filed by the People.

[26] The court flagged as an issue that there was "evidence from Potochnik that he left a shotgun for Ruben for his protection" but the prosecutor had asserted, in his opening statement, that "there will be no evidence produced that a shotgun existed." The prosecutor countered that he only said "there will be no evidence that the shotgun was there." But, in actuality, the prosecutor had stated, "No shotgun was ever found. No nothing to indicate that Ruben Torres ever had a shotgun."

In a subsequent interview with the defense investigator, Potochnik again stated that Wilhite had told him Torres was not able to pull the trigger.

Incidentally, Mathis also stated in his interrogation that he had recently seen Potochnik with a shotgun at Wilhite's house. He further intimated that the shotgun Torres used in the altercation was the same as the one Mathis had earlier seen in Potochnik's hands.[27]

Potochnik called Mathis "a piece of shit" and explained that he only came forward because Wilhite should also have been charged in the case.[28] The prosecutor noted that Potochnik, who was worried about the possibility of felon-in-possession charges arising from any testimony in the matter, had "fled and resisted any attempts to locate him."[29] Defense counsel sought to introduce his recorded statement through Brewer. The prosecutor argued the statement was prejudicial to the prosecution "[b]ecause … it

---

[27] Mathis told Detectives Balasis and Brewer that he had seen the shotgun that was kept at Wilhite's house once before, specifically he saw it "[i]n [Jacob's] hands out at the gate" of Wilhite's property. Mathis appears to suggest that this was the same shotgun that Torres tried to shoot him with, but he does not definitively say so. Regarding the previous incident, Mathis added, "I seen it from a distance. Um, [Jacob] had it. It's a pump, light brown. That's all I know. It had a pistol grip." One of the detectives asked whether the barrel was full size; Mathis responded, "No. It was sawed off." The detective then asked, "Cut off?" Mathis repeated, "Sawed off." When Mathis saw Wilhite and Jacob at the gate with the gun, he "got dropped off around the corner while somebody else went up there and talked to 'em."

[28] Potochnik told the police he gave Torres the shotgun because Torres was sleeping with Wilhite and Potochnik was concerned for Torres's safety on account of Mathis.

[29] Defense counsel informed the court that in talking to the police, Potochnik, who was a felon at the time he purchased the shotgun, exposed himself to prosecution for being a felon in possession of a firearm. In fact, when Potochnik came to court before he became unreachable, he stated he would assert his privilege against self-incrimination. Counsel implicitly argued Potochnik's statement was admissible as a statement against his penal interest, but the statement was nonetheless excluded.

implies that there was a shotgun there." Describing the issue as "close," the court excluded Potochnik's statements as hearsay.[30]

To the extent Potochnik's statements reveal that Torres had a shotgun and was unable to pull the trigger, they echo what Wilhite told Pineda. Furthermore, since Potochnik's statements were excluded as hearsay, the evidentiary value of Wilhite's statement to Pineda was extremely high for the defense.

### *Joshua Connelly's Statements*

Wilhite's declaration is also consistent with the recorded statements of Joshua Connelly, a friend of Potochnik, to both law enforcement and to the defense. Connelly stated that Jacob Potochnik and Potochnik's brother told him that Potochnik bought a shotgun for Torres as protection against Mathis and gave it to Torres. They also told him that the shotgun had jammed during the confrontation between Torres and Mathis, and Potochnik had got rid of it. Connelly believed the shotgun ultimately came into law enforcement custody. Connelly further said that Mathis told him that "he had … beat the shit out that guy" and *been assisted by Wilhite*, and that, thereafter, *Wilhite had tied Torres up with rope*. The defense subpoenaed Connelly to no avail, and Connelly could not subsequently be located. The prosecutor argued that Mathis's statements to Connelly were hearsay; the defense argued they were admissions. The judge excluded the entirety of Connelly's recorded statements as hearsay.

---

**30** The prosecutor argued that Potochnik's statements should be excluded given that John Ruccinni was expected to testify about the role of the shotgun. The prosecutor also said that Mathis's interrogation statement was sufficient evidence in regards to the role of the shotgun. The prosecutor complained that defense counsel "wants a wealth of evidence" of the shotgun to be presented to the jury; he further argued, "[counsel] has two witnesses" in Ruccinni and Mathis, but "[h]e just wants more." Finally, the prosecutor argued he would be prejudiced by the introduction of Potochnik's statement as he had already given his opening statement on the assumption that Potochnik's statement would be excluded. In the end, the court excluded Potochnik's statement and Ruccinni invoked his Fifth Amendment privilege. The jury heard nothing of either Ruccinni's or Potochnik's statements.

*Rodney Bethell's Statements*

Finally, Wilhite's declaration is consistent with two statements given by Rodney Bethell to a defense investigator. Bethell's statements, included in the record, echo the substance of Wilhite's declaration.[31] The statements disclose that Potochnik gave an old shotgun to Torres for protection from Mathis and that the shotgun was kept at Wilhite's house. The defense called Bethell as a witness. Bethell testified, outside the presence of the jury, that Torres told him, two days before he died, that he had a shotgun to protect himself and Wilhite from Mathis. However, when the defense attempted to elicit information about the shotgun from Bethell in front of the jury, the judge cut off the

---

[31] The record contains two statements from Rodney Bethell to the defense investigator. The investigator documented Bethell's statement of September 24, 2013, as follows: "Bethell said he went to Wilhite's residence Sunday after Torres['s] death to see what she knew. [¶] Wilhite was emotionless and acted like she already knew. Bethell stated he knew R[u]ben Torres was given an old shotgun from Jacob Potochnik for protection. Chasi[d]y Wilhite eventually told Bethell that she wanted Mathis to come to her residence, but she did not tell Mathis that Torres was there. Bethell said when Wilhite had both Torres and Mathis at her property, Torres pointed the shotgun at Mathis, but it did not fire when he pulled the trigger. Mathis then beat up Torres. Wilhite also told Bethell that she was upset with Torres because she found out he was stealing from her." The report continues as follows: "Bethell said after Torres['s] body was found he spoke to Detective Brewer. He stated he told the detective that someone told him that that they saw Wilhite hit Torres with a metal pipe after Mathis beat him up.… Bethell explained that Jackie O'Shaughnessy also said that Wilhite admitted to her that Torres pointed the shotgun at Mathis and tried to pull the trigger. Mathis then beat up Torres, but Wilhite also h[i]t Torres with a metal pipe. Bethell stated that he and O'Shaughnessy discussed this after two lady investigators were at their residence. He said O'Shaughnessy admitted that she did not tell the whole truth because she did not want to go to court."

The defense investigator documented a follow up statement from Bethell on September 25, 2013, as follows: "Bethell indicated that he saw R[u]ben Torres two days before he passed …. He explained that Torres was talking about Jacob Potochnik giving him an old shotgun and teaching him how to shoot. Torres told Bethell he was in love with Chasi[d]y Wilhite and the shotgun was to protect himself from Mathis. Torres also told Bethell that Potochnik was going to watch his back, and the shotgun was kept at Wilhite's house. Bethell stated he tried to give Torres advice and told him not to get wrapped up in love with Wilhite."

59.

questioning on hearsay grounds; the jury did not hear about the shotgun. In light of the exclusion of Bethell's testimony regarding the role of the shotgun, Wilhite's declaration to Pineda was the defense's only hope of introducing evidence about the shotgun as well as Wilhite's actions in relation to the killing.

In sum, Wilhite's declaration was consistent with the accounts of several potential witnesses, all of whom connected Wilhite to the crime in some way. These witnesses also indicated that, in the days leading up to the killing, a sawed-off shotgun was kept at Wilhite's house for Torres to use against Mathis and that the shotgun played a role in the killing. In addition, an actual shotgun in police custody was identified as one Wilhite was trying to get rid of because it was used in a murder. The trial court was aware of all these statements, none of which were presented to the jury. Because the other evidence of Wilhite's involvement and of the shotgun had already been excluded by the trial court, Wilhite's declaration was critical to Mathis's defense, i.e. that he had not planned or intended to kill Torres but reacted to Torres's attempt to shoot him.

## C. *Prejudice*

Having determined above that the court erred in excluding Pineda's proffered testimony regarding Wilhite's declaration on the basis that it was not sufficiently reliable to warrant admission, we must now decide whether the error was prejudicial. Mathis argues that we should apply the *Chapman* standard of prejudice that applies to federal constitutional error because the court's ruling violated Mathis's right to present a defense and to due process under *Chambers v. Mississippi* (1973) 410 U.S. 284. (See *Chapman v. California* (1967) 386 U.S. 18, 23-24 [evaluating whether court's error was harmless beyond a reasonable doubt].) *Chambers v. Mississippi* is, however, distinguishable from the facts of this case; furthermore, "only evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.) Here, Mathis's version of events, including his statement that Torres pointed a shotgun at him, was in evidence

60.

as a video recording of his police interrogation and was played for the jury. Moreover, Wilhite's declaration, as proffered by the defense, did not directly and unequivocally exculpate Mathis. The standard for evaluating state law error enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) (i.e., whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error") applies to the evidentiary error here. The error, however, is prejudicial even under that standard. (Cf., *Cudjo v. Ayers* (9th Cir. 2012) 698 F.3d 752, 765-768 [*Chapman* applies where excluded evidence is critical to defense].)

Wilhite's declaration significantly enhances the credibility of Mathis's interrogation statements that formed the lynchpin of his defense, i.e., that Torres came at him with a shotgun, that Wilhite was involved in the assault, and that Wilhite gagged and tied Torres up. Along with Mathis's own statements, Wilhite's declaration is relevant to the issue of Mathis's intent and state of mind in beating Torres up, which the outcome of this case turns on. The declaration lends credence to Mathis's explanation that he did not intend to kill Torres but "fucking flipped" when Torres confronted him with a shotgun and that he "wasn't taking anything serious" until Torres "actually racked [the shotgun] [¶] … [¶] and pointed it and it didn't fire." Thus, Wilhite's statements substantially weaken the case for premeditated murder. At the same time, they support the proposition that Mathis killed Torres rashly, impulsively, recklessly, or in the heat of passion and was, therefore, guilty of either second-degree murder or voluntary manslaughter. The declaration would also explain why Wilhite would want the shotgun removed from the scene, thereby corroborating Mathis's statement that either Wilhite or Ledlow disposed of the gun. Furthermore, to the extent the statements reveal that Wilhite instigated the assault and was angry at Torres for stealing from her, the statements undercut the prosecution's central argument that Mathis, motivated by raging jealousy, independently came up with a plan to kill Torres.

61.

Wilhite's statements undercut several other aspects of the prosecution's case and final arguments as well. For example, the prosecutor repeatedly suggested in closing that the fact that 49 bruises were found on Torres's body reflected a prolonged attack, which in turn indicated that Mathis had acted with deliberation and premeditation. The prosecutor also asserted that Mathis did not want to tell the truth to the police and lied when he said he hit Torres only 15 to 20 times. Wilhite's statement that she hit Torres along with Mathis suggests that she was responsible for some of the bruises and injuries on Torres's body, thereby blunting the prosecutor's arguments that the number of injuries was indicative of a prolonged beating, that Mathis was downplaying the viciousness of his attack on Torres, that the blows delivered by Mathis were independently fatal, and that the extent of the injuries on Torres's body led to an inference that Mathis acted with premeditation and had decided to kill Torres.[32]

Next, Wilhite's statement that she was responsible for gagging and tying Torres up corroborates Mathis's statement to the same effect. In his interview, Mathis told the police it was Wilhite who tied Torres up with rope, "put a gag in in his mouth," and put a laundry bag over his head. As for himself, Mathis stated he did not even know whether Torres was breathing because he was "scared to death" and "wasn't tripping on nothing like that." Wilhite's statement makes her liable—and exonerates Mathis—for Torres's possible asphyxiation, which was identified by Dr. Pizarro, as one of the causes of his death.

---

[32] The prosecutor argued as follows: "We documented – Dr. Pizarro documented 50 – 49 different injuries and yet the defendant said he only did 15 to 20. Well, because he had to admit some, but 50 sounds excessive. Fifteen to 20 sounds maybe that's a little bit of a fight. Maybe it's two guys going at it. [¶] But that's not the case. There was 49, almost 50. I won't say there's 50, but there's almost 50 documented injuries. [¶] If the defendant was going to tell the truth, he would have talked about it. He wouldn't have lessened the number. He's talking about a third. Less than a third of what actually happened. [¶] Again, minimizing his [e]ffect. Fifteen, a third of that is 45. He's still not even a third – he's got two-thirds that he's not telling you about."

Thus, in detailing Wilhite's role in the attack on Torres, Wilhite's declaration diminishes Mathis's culpability for some of the acts that were done after the physical assault on Torres. This, in turn, has a bearing on his intent before and during the incident, especially in light of specific arguments made by the prosecutor. In his closing argument, the prosecutor repeatedly argued that the fact that Mathis tied Torres up showed that he did not act in self-defense or in the heat of passion. As one example, in the context of self-defense, the prosecutor argued that even if Torres had been fighting back, "[h]ow do you get past the asphyxiation? How do you get past the rope around Ruben Torres's neck? You don't. You can't." The prosecutor also argued that tying someone up in the manner that was done here showed a conscious disregard for human life.

Torres had a level of methamphetamine in his system that was 200 times the lethal level and was identified by Dr. Pizarro as another cause of Torres' death. There was no evidence in the record regarding the source of Torres's methamphetamine intoxication or when Torres became intoxicated; nonetheless the prosecutor argued that Mathis had drugged Torres after beating him up. Mathis's statement to the police is silent on these points but Mathis did state that Torres "slams a lot" and also that Torres approached Wilhite to smoke dope with him and his friend as a ruse to get together with her. The prosecutor argued a chronic user would not take the amount of methamphetamine that was found in Torres's system so it was more likely that "Ruben was not a methamphetamine user." He further argued, "Well, no meth was found in his system at any time prior to this…. A drug overdose would be a great way to try and hide a murder. Hey, the guy just used drugs. He OD'd. Sorry. [¶]… [¶] Two hundred times. How much would you have to take? Well if you weren't taking it voluntarily, somebody would just keep forcing it into your system. *It's reasonable to conclude that Danny Mathis would want to cover up the crime by force-feeding methamphetamine to Ruben Torres.*" (Italics added.) Dr. Pizarro, in stark contrast to the prosecutor's argument,

63.

stated he was not aware of any investigation into whether Torres was force-fed methamphetamine.

In rebuttal, the prosecutor added that the toxicology report only showed that methamphetamine was present in Torres's system *after* the incident and therefore it would be reasonable for the jury to infer that methamphetamine was forcibly administered after Torres was tied up. He argued, "Where is the evidence that there was meth in [Torres's] system before the assault, before he was tied up? [¶] Wouldn't you have wanted to hear that if that evidence was there?" The prosecutor's argument bolstered the case that Mathis acted with deliberation and premeditation; the admission of Wilhite's declaration would have rebutted this argument to some extent. In the declaration, Wilhite admits she was deeply involved in the crime, and, in fact, "set Torres up." Since she was closer to Torres, admission of the declaration could lead to the more reasonable inference that Torres's intoxication was encouraged, facilitated, or orchestrated by Wilhite, if anyone, possibly to get him to be aggressive or reckless. [33]

Given that Wilhite's declaration corroborated Mathis's contention that Torres tried to shoot him, it was central to Mathis's defense that he beat Torres out of fear, in the heat

---

[33]     We question the prosecutor's argument that the jury could reasonably conclude that Mathis force-fed methamphetamine to Torres. Although Dr. Pizarro testified that toxicology tests performed on Torres revealed that he had over 200 times the lethal amount of methamphetamine in his blood, there is no evidence in the record indicating that Mathis administered the methamphetamine to Torres. The jury may only draw reasonable inferences from the evidence. Here there was no evidence to support an inference that Mathis forcibly administered methamphetamine to Torres, or that he did so after Torres was tied up, rendering the prosecutor's arguments nothing more than pure speculation. Earlier, the prosecutor had himself noted that any attempt to define how Torres came to be acutely intoxicated would be speculative. After Dr. Pizarro admitted, "I don't see any investigation on – if he was force-fed or he was drugged," defense counsel asked, "So he could have – it's reasonable to say that it was a volitional ingestion?" Dr. Pizarro responded, "It's possible." The prosecutor objected, "I'm going to object as exceeds the scope of the expertise of this witness. Calls for speculation …." The judge ruled, "Sustained on speculation" and struck Dr. Pizarro's answer.

of passion, and without deliberation and premeditation. The court's exclusion of this evidence became more prejudicial in light of the prosecutor's refutation of this defense on the basis, specifically, that there was no corroboration of Mathis's explanation that he acted in reaction to having a shotgun pointed at him and, indeed, of the existence of any shotgun in Torres's possession.

The prosecutor argued in his opening statement that no shotgun connected to the offense was ever found.[34] Specifically, the prosecutor asserted, "One thing that the evidence won't show is that there was a shotgun. No shotgun was ever found. [¶] You'll hear Danny Mathis say Chasidy must have gotten rid of it. Sharon must have gotten rid of it. Someone got rid of it. It was never found. No shotgun was ever found. No nothing to indicate that Ruben Torres ever had a shotgun." Throughout the trial, the prosecutor then adamantly opposed the admission of any evidence corroborating Mathis's claim that Torres tried to shoot him with a shotgun, arguing, in one instance, that such evidence was prejudicial because it would show that a shotgun was there. In another instance, the prosecutor successfully opposed admission of evidence regarding the shotgun on grounds that it would prejudice his case given his assertion, in opening statement, that there was no evidence to show that Torres ever had a shotgun. The prosecutor made and prevailed on this argument despite the fact that, prior to trial, the court had reserved its final ruling on the admissibility of the evidence in question and, in fact, delivered its final ruling after the prosecutor's opening statement.[35]

---

[34] A shotgun that Wilhite had described as being used in a murder was found by law enforcement in John Ruccinni's abandoned car, according to the prosecutor's own statement to the court.

[35] The evidence at issue in this instance was Jacob Potochnik's statement to Detective Brewer about buying a shotgun and giving it to Torres. The trial court did not make a final ruling on the admissibility of Potochnik's statement prior to trial because the defense wanted to review a recording of the statement, which the prosecution had failed to turn over, despite an early written defense discovery request for recordings of any statements made by potential witnesses. After the issue was discussed at the motion in

Finally, in closing, the prosecutor argued, "Now was there a shotgun? There was two people that was there. One of them can't testify because he's dead. The other one told you via his recorded statement. But is it to be believed? No. No. [¶] A reasonable person would have preserved something like that because you know it would have saved you from this type of case." In addition, the prosecutor argued, "One of the things consistent throughout Danny Mathis's statement is that other people are to blame. Sharon's to blame. Chasidy's to blame. Ruben's to blame. He says that why would he put himself in a position to make me do this? [¶] And then he says, well, Ruben is to blame because he pointed a shotgun. *There's no evidence of a shotgun*. He would have saved that." (Italics added.) Wilhite's statement that she instigated the assault by setting Torres up with an inoperable shotgun not only corroborates Mathis's statement that the shotgun existed but also indicates that Wilhite had a reason to get rid of the gun.

Further, the prosecutor emphatically and specifically argued, in repudiating the possibility that Mathis acted in the heat of passion or in self-defense, that there was no corroboration of Mathis's statement that Torres threatened him with a shotgun. For example, at one point in his closing, the prosecutor asked, "Of course now no one puts the shotgun at the scene except for Danny Mathis. Right?" He subsequently added, "Remember, the only source of any of this imperfect self-defense or perfect self-defense [based on the shotgun] is the defendant himself. A man who lied repeatedly in the interview. Over and over and over and over again." The prosecutor repeated the "liar" refrain a short time later, stating, with regard to potential self-defense and imperfect self-

limine hearing on September 26, 2013, the prosecutor agreed to provide the defense with a copy of the recording. Trial began on September 30, 2013, and on October 2, 2013, the defense filed a motion to admit Potochnik's statement. Notwithstanding the fact that the prosecutor had belatedly turned over the recording of the statement only days before, he argued against admission of Potochnik's statement, as follows: "[T]he People would argue that we have been prejudiced by this failure to review these tapes until … after the trial and the jury has already been selected and I beg[a]n my opening statement." The court excluded Potochnik's statement.

defense theories, "It's only source is from a liar. A self-admitted liar." At another point the prosecutor stated, "And then [the detectives] ask [Mathis], well, weren't you concerned? Ruben had a gun. You told us that. No one else told you [the jury] that, but [Mathis] told you that."

Similarly, in his rebuttal argument, the prosecutor argued the jury should disregard Mathis's claim of a shotgun pointed at him because if there had been any evidence to corroborate his claim, it would have been presented to the jury. The unmistakable implication of the prosecutor's argument was that that since no corroboration was offered by the defense, the jury could infer that none existed. Specifically, the prosecutor stated, "If there was evidence of a shotgun, it could have – it would have come in. It didn't. It didn't. He's the only one that put the shotgun there, and that's only when he has to explain why he did what he did." In sum, the prosecutor referenced the lack of corroboration of Mathis's statement about a shotgun in his opening, closing, and rebuttal arguments. Clearly, the prosecutor himself believed that evidence corroborating Mathis's claim that Torres attempted to shoot him would have been pivotal to the outcome of the case.[36]

The evidence clearly showed Mathis was guilty of killing Torres; however, the issue the jury appeared to grapple with, as reflected in the questions it submitted to the court during deliberations, was whether the crime was first degree murder, second degree murder, or voluntary manslaughter based on a heat of passion theory. The prosecutor argued in closing, "[Mathis] decided. He deliberated. He thought about the consequences when he decided to tie Ruben Torres up. He had a plan to go to Ruben's house, to tear him up, and to kill him. [¶] And he did that through blunt force trauma,

---

[36] The prosecutor also argued, with regard to Mathis's statement that in the days leading up to the killing, he had heard that Torres had made threats against him, as follows: "Now, we also heard that Ruben threatened Danny. And that's the testimony of one witness."

67.

through asphyxiation, and through intentionally overdosing Ruben Torres. [¶] … [¶] He stole the life of Ruben Torres because he was jealous that Ruben Torres was with his ex-girlfriend. He is guilty of first-degree murder." Mathis's only defense to the charge against him was that Torres tried to shoot him with a shotgun, which caused him to freak out and violently attack Torres.

Once Mathis admitted his culpability to the police, he consistently stated that he never intended to kill Torres but "fucked up" when Torres brought out the shotgun. The prosecutor strenuously argued in his closing that the jury should disregard Mathis's claim because he was the only one who said there was a shotgun at the scene. The prosecutor even said that had any corroboration existed, the jury would have known about it. Wilhite's statements, had they been admitted, would have supplied the missing corroboration. They would also, if believed, have negated or raised a doubt about Mathis's culpability for Torres's possible asphyxiation, and rebutted, to some extent, the prosecutor's improper suggestion that Mathis must have drugged Torres. Finally, since the declaration reveals that Wilhite instigated the confrontation and was angry at Torres for stealing from her, it undermines the motive of a jealous rage that the prosecutor ascribed to Mathis. In the end, had the declaration been admitted, it would have helped Mathis mount a far more effective defense than he actually presented to the jury; at the same time, its admission would have precluded many of the prosecutor's arguments. (See *Cudjo v. Ayers, supra,* 698 F.3d at pp. 768-770.)

The jury nonetheless deadlocked on the question of whether Mathis was guilty of first degree murder. The jurors sent a note to the judge stating, "we are not able to agree on 1st degree," in accordance with the judge's instruction to inform him if they "cannot agree whether the defendant is guilty of first-degree murder." The jury returned a verdict of first degree murder only after the judge sent it back to deliberate further. The fact that the jury deadlocked indicates that one or more jurors were in favor of a different outcome in the case and that the unanimous verdict was not easily reached. Moreover, prior to

deadlocking, the jurors sent a note asking, "what instruction applies to the 1st degree murder or 2nd degree or Both? [I]n regards to malice of aforethought. (Instruction # 520)." CALCRIM 520, which defines express and implied malice, states that proof of either one is required for murder, and finally directs, "[i]f you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree." The jurors' question as to the meaning of CALCRIM 520 reveals they were confused as to what malice requirements applied to first and second degree murder, respectively. The judge provided the following explanation to the jurors: "either express or implied malice is sufficient to establish the state of mind of malice aforethought as required for 1st and/or 2nd degree murder."

The judge's explanation misstated the law in that it indicated the jurors could convict Mathis of first degree murder based on a finding of implied malice. (*People v. Moon* (2005) 37 Cal.4th 1, 29; *People v. Knapp* (1886) 71 Cal. 1, 6.) Despite being erroneously told that a first degree murder conviction could rest on a finding of implied malice, the jury nonetheless deadlocked on the question of first degree murder and only convicted Mathis of this offense after they were directed to undertake further deliberations.

Under these facts, we find the court's exclusion of Pineda's testimony regarding Wilhite's declaration was prejudicial error. It is reasonably probable the outcome of the proceedings would have been more favorable to Mathis, if Pineda's testimony, as set forth in the defense's offer of proof, was presented to the jury.[37] Accordingly, we reverse Mathis's conviction and remand the matter for a new trial. In light of our resolution, we need not address the other issues raised by Mathis.

---

[37] Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.)

**DISPOSITION**

The judgment is reversed.

                              _____
                              FRANSON, J.

WE CONCUR:

_____
POOCHIGIAN, ACTING P.J.

_____
SMITH, J.